IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARY LAROCHELLE, et al.** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **12-CV-5567** |
| **WILMAC CORPORATION, et al.** | : | |
| | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**Stengel, J.**                                          **September 27, 2016**

## I.    INTRODUCTION

The plaintiffs, Mary LaRochelle, Sandra Riker, Emilia Shearer, Candice

Galbreath, and Nicole Vasquez brought this employment discrimination action against

Lancashire Hall, Wilmac Corporation, Wilmac Health Care, Inc., and McWil Group

Limited (collectively "Defendants"). The plaintiffs were formerly employed at

Lancashire Hall, a nursing home, as Certified Nurse Assistants ("CNA"). The plaintiffs

bring claims under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), Title

VII of the Civil Rights Act ("Title VII"), the Americans with Disabilities Act ("ADA"),

and the Pennsylvania Human Relations Act ("PHRA"). Plaintiffs also bring claims for

wrongful discharge under Pennsylvania state law. Defendants filed four motions for

summary judgment regarding the claims of plaintiffs LaRochelle, Riker, Shearer, and

Vasquez. For the reasons that follow, I will deny summary judgment with respect to

LaRochelle's Title VII retaliation claim, Vasquez's Title VII retaliation claim, and

Shearer's ADA retaliation claim. Defendants' motion as to all other claims is granted.

## II.   BACKGROUND

Although the plaintiffs shared the same employer, their allegations of

discrimination are factually unique. Therefore, the facts underlying the claims of each

plaintiff are set forth, individually, below.

### A.   *Mary LaRochelle*

Plaintiff Mary LaRochelle ("LaRochelle") is a forty-seven year old African

American female. Doc. No. 29[1] ¶ 23. LaRochelle was hired by Lancashire Hall as a CNA

beginning on June 15, 2010. Doc. No. 64-2[2] ¶ 1. Lancashire Hall is a nursing facility in

Lititz, located in Lancaster County, Pennsylvania.  Doc. No. 29 ¶ 47. Both parties agree

that LaRochelle was hired on a PRN (as needed) basis. Doc. No. 84-2[3] ¶ 2. According to

LaRochelle, she worked 11:00 p.m. to 6:00 a.m. Sunday through Thursday and 11:00

p.m. to 7:30 a.m. on Friday and Saturday nights. Id. ¶ 4.  On September 1, 2010,

Lancashire Hall decided that full time, part time, and PRN staff would only be permitted

to work full shifts.  Doc. No. 64-2 ¶ 4.

Soon after she was hired, LaRochelle claims a co-worker, Teddy Bernard, began

to harass her. Doc. No. 84-2 ¶ 27. Bernard was hired on June 29, 2010, shortly after

---

[1] Pl.'s Third Am. Compl. ¶ 23. Many of the documents referred to by the parties in this case were filed under seal. Throughout this opinion, when a document is referred to by its actual title (rather than by "Doc. No."), that means it has been filed under seal.

[2] Defs.' (Unredacted) Statement of Material Facts Regarding Plaintiff Mary LaRochelle.

[3] Pl. LaRochelle's Counter-Statement of Disputed/Undisputed Material Facts.

LaRochelle was hired.  Id. According to LaRochelle, Bernard came up from behind her and wrapped his arms around her while pressing his body against her and touching her breasts.  Id.  LaRochelle also states Bernard said "let's hook up" to her.  Id.  Bernard purportedly grabbed LaRochelle's hips and made sexual comments.  Id.  LaRochelle alleges she complained about Bernard's behavior to Human Resources Director Tonya Garcia, Administrator Michael Stuck, and Corporate Vice President of Human Resources Tom Shugars.  Id.  Following her complaints about Bernard's behavior, Bernard's advances apparently intensified and he threatened her saying, "Since I have your attention it would be in your best interest to do what I want."  Id.  LaRochelle says she asked Elizabeth Woland to reassign her to a different wing, but Woland told her that because she was PRN she had to work where she was assigned.  Id.

In September 2010, LaRochelle was working on the Rehab Wing under the direction of Charge Nurse Baron Geib.  Id.  In front of Geib, Bernard allegedly slapped LaRochelle on the "behind" and said to "give me some of that ass."  Id.  LaRochelle told Bernard to remove his hands and Geib laughed and said, "Teddy keep your hands off our House Nigger."  Id.  LaRochelle went to Night Supervisor, Donna Astree, to tell her that she would like to call the police and file a report for assault, but Astree told LaRochelle that she "was not allowed to call the police because the matter had to be handled in-house."  Id.  LaRochelle gave a written complaint to Astree who assured that the complaint would go to Human Resources.  Id. LaRochelle then reported the incident to Garcia who told LaRochelle that she had to follow the "chain of command."  Id.  On September 22, 2010, LaRochelle spoke with Stuck at 3:15 p.m. about Bernard's behavior

3

toward herself and other female employees, and about Geib's alleged racial harassment. Id. Following investigation and suspension, Bernard was fired by Defendants on July 6, 2011. Doc. No. 64-2 ¶ 28.

According to LaRochelle, Geib told her that he was going to request that LaRochelle work on his wing because she did not talk "'ghetto' like every other Nigger there." Doc. No. 84-2 ¶ 38. Geib said to LaRochelle that she was "going to be Rehab's House Nigger." Id. LaRochelle told Geib that she was highly offended and went to Supervisor Harold Go's office to report Geib's statements. Id. LaRochelle claims Go told her that Geib was "just joking and that Plaintiff shouldn't take it so seriously." Id. LaRochelle told Go that she was not happy with that and Go said to her that he would speak with Geib. Id.

According to the Defendants' employee handbook, an employee who is "absent from work for two (2) unexcused days without giving proper notice to the facility will be considered as giving their voluntary resignations (abandonment of job)." Doc. No. 64-2 at ¶ 9 (citing Ex. E, Wilmac Family Handbook). Defendants' schedule reflects that LaRochelle was scheduled to work shifts on October 1, 2010 and October 2, 2010. Id. at Ex. D. The Defendants state that LaRochelle did not call or show for her October 1 and 2, 2010 shifts and therefore LaRochelle was terminated from her employment. Doc. No. 64-2 at ¶ 9. LaRochelle disputes her termination, stating that she was terminated on the morning of October 1, 2010, before her 11:00 p.m. shift began. Doc. No. 84-2 at ¶ 7. LaRochelle states that prior to her termination, she went to Director of Nursing Elizabeth Woland with a written statement of the discrimination and harassment mentioned above.

Id.  LaRochelle maintains that Woland tore up LaRochelle's statement and threw it in the trash.  Id.  After LaRochelle left Woland's office, Woland telephoned LaRochelle to tell her that her "services were no longer needed" and that she was terminated from employment.  Id.

### B.    Sandra Riker

Sandra Riker is a white female born in 1964.  Doc. No. 29 ¶ 46.  On May 19, 2009, Riker was hired as a CNA at Lancashire Hall.  Id. at ¶ 47. In February 2009, Riker reported a work injury to her thumb as a result of a combative patient.  Doc. No. 85-4[4] ¶ 3.  The injury did not result in time lost from work or light duty and Riker did not collect workers' compensation for that injury.  Id.  Around two years later, on June 23, 2011, Riker left a note under the door of the Human Resources Director, Tonya Garcia, reporting co-worker Teddy Bernard for sexual harassment and patient abuse.  Doc. No. 66-2[5] ¶ 4.  Riker's June 23rd note states that "Teddy Bernard came up behind me, hugging me (from behind) & saying 'You know you still my girl.'  Because this behavior has largely been ignored by licensed staff I fear retaliation for my concerns."  Def.'s MSJ Ex. E.  In response to Riker's note, on June 27, 2011, Garcia contacted Riker.  Def.'s MSJ Ex. F.  Riker explained the incident with Bernard to Garcia and advised Garcia that she did not want Garcia to look into the incident further, but rather she just wanted the nurses to know what to do if someone reports an incident to them.  Id.  Riker also stated that she felt comfortable working on the floor with Bernard, but that she was going to talk

---

[4] Pl. Riker's Counter-Statement of Disputed/Undisputed Material Facts.

[5] Def.'s (Redacted) Concise Statement of Material Facts Regarding Pl. Riker.

to Bernard herself to let him know she felt uncomfortable with the situation.  Id.  Riker revealed that many other employees felt uncomfortable working with Mr. Bernard, but she would not give the names of those employees to Garcia.  Id.  A few days after her conversation with Riker, Garcia launched an investigation of Bernard which spanned from June 30, 2011 through July 1, 2011.  Doc. No. 66-2 ¶ 10.  Garcia took statements from several of the employees working with Bernard.  Id. ¶ 11.  Bernard was suspended following the investigation.  Id. ¶ 14.  On July 6, 2011, Bernard was terminated.  Id. ¶ 16.

Riker contends that the June 23, 2011 letter to Garcia was not the first time that she had reported Bernard.  Doc. No. 85-4 ¶ 4.  The first time that Riker says she brought up concerns regarding Bernard's behavior was around June 2010.  Id.  Riker told RN Supervisor Donna Astree that Bernard would "yell and scream at Plaintiff Riker so loudly that the incident caused Plaintiff Riker panic attacks and 'horrific memories of her ex-husband.'"  Id.  On September 26, 2010, Riker reported to Garcia and Administrator Michael Stuck that Bernard had sexually harassed another co-worker, Joanne Leon-Jeremiah, after Leon-Jeremiah had told him to "stop touching her and stay out of her personal space."  Id.  Additionally, Riker reported that Bernard had brought in alcohol for a resident patient and had conspired with that resident to accuse Leon-Jeremiah of abusing the resident.  Id.  According to Riker, Garcia told Riker that she would only accept Riker's statement once Riker "was an actual sexual assault recipient of Teddy Bernard and not just a third party victim of harassment."  Id.  (citing Riker Resp. to Interrog. p. 15 Ex. N).

6

Riker also requested that Linda Davis, a Staff Development member, provide her a copy of the company's sexual harassment policy and for Davis to identify the compliance officer by name and provide a phone number for the officer. Id. Riker claims the name and phone number of the compliance officer was never provided to Riker and that the company's Handbook was missing pages for sexual harassment policy. Id. When Davis asked Riker why Riker wanted the policies, Riker states she told her about Bernard's behavior. Id.

Riker alleges that she called and left a message on the company's hot line regarding Bernard's behavior for the Vice President of Human Resources, Tom Shugars, but Shugars never called her back. Id. Additionally, Riker reported Bernard's behavior to Charge Nurse Margaret Boulton, Director of Nursing Kathy Umberger, LPN Charge Nurse Mischaellle Santiago and LPN charge Nurse Tara Osborne. Id. In addition to reporting Bernard, Riker also reported to Garcia that there was a pattern and practice of sexual harassment from male supervisors including Titus Leitoro, Jim Hernandez, and Loi Nguyen and that female staff were treated "differently and disparately." Id.

Five months after Bernard was fired, on October 30, 2011, Riker slipped and fell on ice outside of the Lancashire Hall building. According to the Defendants, Riker was issued a Notice of Ability to Return to Work by Dr. John Perry on April 19, 2012 which permitted Riker to go back to her pre-injury job without restrictions. Doc. No. 66-2 ¶ 19. Riker disputes this and states that her treating physicians, Lancaster Orthopedic Group,

returned her to work with light duty restrictions.[6]  Doc. No. 85-4 ¶ 19.  The Defendants also claim that after being issued the notice by Dr. Perry, Riker advised Garcia that she had received non-work related burns while she was out on workers' compensation and could not return because of those injuries.  Doc. No. 66-2 ¶ 20.  Riker claims that the Defendants initially accepted Riker's work injury claim but on January 20, 2012, the Defendants denied her workers' compensation claim and refused to accommodate Riker's "non-work related" disability.  Doc. No. 85-4 ¶ 20.  According to Riker, January 3, 2012 was her last day of work.  Id.  However, on February 14, 2013, in connection with settling workers' compensation claims against Defendants, Riker signed a resignation letter which declared that her resignation was voluntary.[7]  Def.'s MSJ Ex. L. Riker was represented by counsel when she signed the resignation letter, and she testified that she understood it and had no questions concerning the letter or any other documents involving the settlement of her workers' compensation claims. Ex. P to Defs.' MSJ Regarding Riker, Riker Dep. 7:16–19; id. 13:6–18.

Riker filed her charge of discrimination with the EEOC on February 1, 2012, alleging gender and age discrimination.  Doc. No. 85-4 at ¶ 23.  Riker collected

---

[6] Plaintiff provides medical records which indicate that Lancaster Orthopedic Group did indicate that she should return to work with light duty restrictions; however, the return to work date cited on the medical records was January 18, 2012.  Pl.'s Ex. X.

[7] The document states as follows:

> To Whom It May Concern:
>
> I Sandra Riker hereby voluntarily resign my employment from Lancashire Hall/McWill [sic] Group.  This resignation is voluntary.  I was not coerced by anyone into making this decision.

Def.'s MSJ Ex. L.

unemployment compensation benefits from the Defendants beginning with waiting week ending February 4, 2012.  Id. at ¶ 20.  On August 30, 2012, Riker filed an amended charge of discrimination with the EEOC, adding claims of retaliation and disability discrimination, and a charge of discrimination on the basis of association with protected individuals under Title VII.  Id. at ¶ 23. On February 14, 2013, Riker also signed a Compromise & Release Agreement, which was a "full settlement of all claims against Lancashire Hall/McWill Group or its Workers' Compensation Carrier for all injuries Claimant sustained on 10/30/11 or 2/1/11 or at any other time Claimant was employed by Defendant.  Defs.' MSJ at Ex. K, p. 3.

### C.    Emilia Shearer

Plaintiff Emilia Shearer ("Shearer") is a Hungarian female born in 1960 who, according to herself, speaks English with a heavy accent.  Doc. No. 29 ¶¶ 63, 64.  Shearer was hired at Lancashire Hall as a CNA in March 2010.  Pl. Emilia Shearer's Counter-Statement of Disputed/Undisputed Material Facts ("Pl. Shearer's Counter") ¶ 1.  Shearer started her position as CNA working the night shift on the Baker Wing.  Id. at ¶ 2.  After a time, Shearer requested that she be moved from Baker Wing to another floor because a co-worker, Maddie Mentzer, was allegedly ridiculing Shearer's accent and ethnicity.  Id. at ¶ 4.  Shearer was then moved to the Rehab Unit.  Id. at ¶ 6.  While working in the Rehab Unit, Shearer began to have problems with Supervising Nurse Lisa Noll and Charge Nurse Baron Geib.  Id. at ¶ 7.  Shearer alleges that Geib called her a "stupid immigrant" and a "bitch."  Id.  Shearer also alleges that Geib told her that "if I was your husband I would beat the crap out of you," and "all aliens should be made to return to

their countries." Id.  Furthermore, Shearer claims Geib instructed co-workers not to help Shearer even in situations where two persons were needed.  Id.  According to Shearer, Noll tolerated and encouraged Geib's behavior.  Id.  When Shearer confronted Supervisor Noll about the harassment that she was suffering, Shearer claims Noll "tormented and retaliated" against Shearer.  Id.

On October 30, 2010, Shearer hurt herself while repositioning a resident and reported the claim as a workers' compensation injury.  Id. at ¶ 8.  Following her injury, Shearer was placed on light duty.  Id. at ¶ 9.  On May 23, 2011, Shearer was suspended for three days after a resident reported alleged abuse to Social Services.  Defs.' Facts Re. Shearer ¶ 11.  Upon employment, Shearer signed a copy of the Wilmac Corporation Resident Abuse Policy which states that "[i]f the allegations are not substantiated, the employee will be returned to work with no loss of earnings and no negative report or record will be documented."  Id. at ¶ 10; Defs.' MSJ Ex. C. Shearer was issued an Employee Discipline Notice for the incident on June 9, 2011.  Id. at ¶ 12; Defs.' MSJ Ex. E.  On June 2, 2011, Shearer received a second report of abuse allegations and was suspended from June 2 until June 6, 2011.  Id. at ¶ 14.

On July 30, 2011, Shearer reported another work injury to her back and she was sent to the company doctor, Dr. Rochester.  Id. at ¶ 16.  Dr. Rochester placed Shearer on light duty for two (2) months.  Id.  On or about September 21, 2011, Shearer requested FMLA leave to care for her husband and was eligible for FMLA provided that she gave sufficient certification by October 6, 2011.  Defs.' Facts Re. Shearer ¶ 17; Defs.' MSJ Ex.

G.  On September 27, 2011, Shearer was accused of resident abuse again for yelling at a resident.  Id. at ¶ 18.  According to Shearer, Diana Myers, the Director of Nursing ("DON"), called Shearer on the phone, placed her on suspension and asked her to come into work to make a statement regarding the alleged abuse.  Pl. Shearer's Counter at ¶ 19.

On the same day that the alleged abuse occurred, September 27, 2011, Shearer suffered another work injury.  Id.  The Defendants contend that Shearer reported that she had suffered a work injury around 2:30 a.m. to Human Resources after giving her statement regarding the alleged abuse to Ms. Myers.  Defs.' Facts Re. Shearer ¶ 20.  Shearer disputes this and states that the work injury was "instantly reported to Charge Nurse LPN Sarah Hilles that [sic] heard Plaintiff fall and assisted Plaintiff from getting up off the floor."  Pl. Shearer's Counter at ¶ 20.  Moreover, Shearer states that Garcia prepared a Supervisor's Report of Employee Incident that erroneously documented the time of the injury at 5:30 a.m.  Id.   The day after her injury, Shearer sought medical attention and had her doctors send work restrictions to Defendants. Ex. UU to Pl. Shearer's Resp. Two days later, following the Defendants' investigation into the alleged abuse, Shearer was terminated.  Ex. T to Pl. Shearer's Resp. On January 9, 2012, Shearer filed a charge of discrimination with the EEOC alleging that she was discriminated against on the basis of race, sex, age, national origin, and retaliation.  Id. at ¶ 33.

**D.    *Nicole Vasquez***

Plaintiff Nicole Vasquez ("Vasquez") is a Hispanic Female.  Doc. No. 29 ¶ 97. Lancashire Hall hired Vasquez as a part-time CNA on January 20, 2009.  Pl. Nicole

11

Vasquez's Counter-Statement of Disputed/Undisputed Material Facts ("Pl. Vasquez's Counter") ¶ 3.  Vasquez was changed over to a full-time CNA in June 2009 until January 2012.  Id. at ¶ 4.  Beginning in March 2013, Vasquez changed to a *pro re nata* ("PRN") agreement in which she was required to work three (3) days a month—two weekend days and one weekday.[8]  Defs.' (Unredacted) Statement of Material Facts Regarding Plaintiff Nicole Vasquez ("Defs.' Facts Re. Vasquez") ¶ 6.

Vasquez was assigned to the Rehab Wing of Lancashire Hall on the second shift when she was hired in 2009.  Id. at ¶ 7.  According to Vasquez, she was subjected to sexual harassment from Bernard when their shifts overlapped.  Pl. Vasquez's Counter ¶ 9. Bernard allegedly "stalked [her], solicited her for dates and sex, violated her personal space and subjected her to unwelcomed touching.  Id.  He would touch her on her back and head, caress her shoulders, come from behind or next to her at the Nurse's Station doing her charting so she would not be on notice of his fast approach."  Id.  Additionally, Bernard would regularly ask her out to eat and to go out on dates.  Id.  Vasquez refused Bernard's advances.  Id.  Bernard would allegedly follow Vasquez into the laundry room to harass her with propositions for "dates and sex."  Id.  The Defendants contend that Vasquez did not report Bernard's alleged behavior until asked to do so as part of Human Resources' investigation into Bernard following Riker's statements about Bernard. Defs.' Facts Re. Vasquez ¶ 20.  Vasquez testified that she did not report Bernard's

---

[8] Vasquez disputes the existence of a PRN agreement.  Pl. Vasquez Counter ¶ 45.  Vasquez introduces as evidence the PRN agreement between Lancashire Hall and Titus Leitoro which requires Leitoro to work one shift per month. Pl. Resp. in Opp. Ex. G.  Defendants claim that Vasquez was required to work three shifts per month and ultimately, the Defendants terminated Vasquez for failing to work three shifts per month as required under her PRN agreement, but the Defendants have not produced Vasquez's PRN agreement on the record.  Defs.' Facts Re. Vasquez ¶ 45.

alleged behavior because she was "afraid of H.R. Representative, Tonya Garcia's alleged boyfriend, and Teddy Bernard's alleged drug dealing father." Id. ¶ 17 (citing Vasquez II, 29:18-24). Vasquez disputes this and states that she reported Bernard's behavior to her Supervisor Alice. Pl. Vasquez's Counter ¶ 17. In her statement made during the investigation by Human Resources into Bernard, Vasquez writes that Bernard's advances toward her stopped after she told him she "was going to get other people involved." Defs.' Facts Re. Vasquez ¶ 21. Additionally, Vasquez wrote that she did not report Bernard because she "did not want to make it a big deal and he eventually stopped asking me." Id. (citing Defs.' MSJ Ex. H). On April 13, 2012, Vasquez filed a charge with the EEOC alleging that she had been "subjected to sexual harassment by Teddy Bernard." Id. at ¶ 23 (citing Defs.' MSJ Ex. J).

On February 25, 2008, Lancashire Hall hired Mr. Titus Leitoro as a Charge Nurse. Pl. Vasquez's Counter ¶ 24. Mr. Leitoro was then moved into the position of Shift Supervisor on February 2, 2010 and eventually became Vasquez's supervisor. Defs.' Facts Re. Vasquez ¶¶ 24-25. On August 10, 2012, Vasquez named Leitoro in her EEOC complaint stating that Leitoro treated her "in a rude, demeaning and retaliatory manner," and that Leitoro "extend[ed] preferential treatment towards female employees that reciprocate[d] his sexual advance [sic]. . . ." Pl. Vasquez's Counter ¶ 26 (citing Pl. Resp. Ex. Z). Vasquez states that Leitoro asked her if he could take her out on a date after their shift was over and when Vasquez told Leitoro no because she had a boyfriend Leitoro responded by saying that he did not care and still wanted to go on a date with her. Defs.'

Facts Re. Vasquez ¶ 26 (citing Defs. MSJ Vasquez Dep. I 57:24; 28:1-2, 3-10).

According to Vasquez, in 2011, she called Shugars to report Leitoro but Shugars told her

to report her complaints to Administrator Stuck.  Pl. Vasquez's Counter ¶ 27.  Vasquez

also handwrote a statement reporting Leitoro's invitation to her and put it in the mail slot

of the Human Resources department, but she never received a response to that statement.

Id. at ¶ 28.  Vasquez testified that Leitoro's harassment was intolerable and interfered

with her ability to work and therefore, she reduced her work hours to part-time to limit

her contact with Leitoro.  Id.

In December 2010, Vasquez was placed on light duty restrictions by her physician.

Id. at ¶ 30.  During this time, Vasquez alleges that the Defendants did not abide by her

light duty restrictions and assigned Vasquez to train a worker which Vasquez was unable

to physically do.  Id.  Leitoro "yelled" at her because she was training one of the workers

and told her "to shut her mouth, that she wasn't worth anything, and that he's her boss."

Id.  Vasquez called the anonymous 1-800 company hotline to report Leitoro's behavior

and spoke with Shugars who told her he could do nothing about it.  Id. at ¶ 32.  On

August 14, 2012, Vasquez filed an amended charge with the EEOC, adding allegations

that she was harassed by Leitoro and treated in a "retaliatory manner" after she refused

his requests for a date.  Defs.' Facts Re. Vasquez ¶ 33 (citing Defs.' MSJ Ex. N).

In November 2009, Vasquez had breast reduction surgery.  Pl. Vasquez's Counter

¶ 34.  When she returned from surgery, James Hernandez, the House Supervisor, told

Vasquez that her breasts were "beautiful" and "looked better smaller."  Id. at ¶  35.

Vasquez reported these comments to Supervisor Donna Astree, but not to Human Resources.  Id. at ¶ 36; Defs.' Facts Re. Vasquez ¶ 36.

Vasquez also alleges that she was subject to racial harassment from Geib.  Id. at ¶¶ 37-40.  Geib told Vasquez that "she was not good enough to live in the United States of America, that she need [sic] to go back to where she came from (Puerto Rico)."  Id. at ¶ 38.  Geib also told Vasquez that "[she] did not speak the American white proper English, and that us spic need to learn how to speak the white American English."  Defs.' Facts Re. Vasquez ¶ 38 (citing Defs.' MSJ Vasquez Dep. II 16:16-22).  Vasquez reported Geib's comment to LPN Kelly.  Id.  After this comment, Geib continued to address Vasquez as "spic."  Pl. Vasquez's Counter ¶ 39.

On August 13, 2013, Garcia terminated Vasquez's employment with Lancashire Hall for Vasquez's failure to work the three shifts per month required under her PRN agreement.  Id. ¶ 45.  There is some contention regarding Vasquez's termination. Vasquez claims that although she changed her status to PRN in March 2013, she never signed a PRN agreement which laid out her required hours.  Id.  Vasquez states that she tried to obtain work hours from the Defendants but was denied them despite work being available.  Id. at ¶ 44.  However, Vasquez states that pay roll records indicate that she worked three shifts in July.  Id. at ¶ 45.  Defendants deny that Vasquez was refused work hours despite them being available.  Defs.' Facts Re. Vasquez ¶ 44.  According to the Defendants, Vasquez did not work the required three shifts a month and therefore, she was terminated.  Id. at ¶ 45.

15

## III.   LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  <u>Id.</u>

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c).  Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex</u>, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.  The

16

Court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252.   In an employment discrimination case, the court must ascertain "whether. . . there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Hankins v. Temple Univ. (Health Sciences Ctr.), 829 F.2d 437, 440 (3d Cir. 1987).  In the context of employment discrimination claims, "conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment."  Taylor v. Cherry Hill Bd. of Educ., 85 F. App'x 836, 839 (3d Cir. 2004).

## IV.   DISCUSSION

The plaintiffs bring a variety of claims pursuant to Section 1981, Title VII, the ADA, and the PHRA. The plaintiffs have also brought wrongful discharge claims under Pennsylvania law. As explained in further detail below, the Defendants are entitled to summary judgment on all claims except for LaRochelle's Title VII retaliation claim, Vasquez's Title VII retaliation claim, and Shearer's ADA retaliation claim.

### A.    *Gender Discrimination Under Title VII and the PHRA*

The plaintiffs have brought two different types of gender discrimination claims pursuant to Title VII and the PHRA.[9] First, plaintiffs allege gender-based disparate

---

[9] In the employment discrimination context, the analysis for adjudicating claims under the PHRA is identical to a Title VII analysis. Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5 (3d Cir. 2006). However, unlike the PHRA and Title VII, Section 1981 applies only to racial—not gender—discrimination. Anjelino v. New York Times Co., 200 F.3d 73, 97–98 (3d Cir. 1999). In other words, Section 1981 does not encompass the plaintiffs' gender discrimination claims. Therefore, the court will confine its discussion of the plaintiffs' gender discrimination claims to Title VII because the PHRA claim is analyzed under the identical substantive lens.

treatment claims.[10] Doc. No. 29 ¶¶ 19, 22. Second, plaintiffs allege gender-based hostile

work environment claims. Id.

### 1.    Disparate Treatment

Title VII makes it unlawful for an employer to discharge or "otherwise

discriminate against any individual with respect to his compensation, terms, conditions or

privileges of employment because of such individual's race, color, religion, sex, or

national origin."  42 U.S.C. § 2000e-2(a).  Plaintiffs pursuing discrimination claims under

Title VII may proceed under either a "pretext" or "mixed motive" theory. Connelly v.

Lane Const. Corp., 809 F.3d 780, 787–88 (3d Cir. 2016). In a mixed motive claim, the

plaintiff claims that the employer's stated reason for termination was based on both

legitimate and illegitimate reasons. Id. at 788. Contrarily, in a pretext claim, the plaintiff

claims that the employer's stated reason was false. Id. Here, plaintiffs have pursued a

"pretext" theory in their disparate treatment claims. Doc. No. 29 ¶¶ 28, 75, 111. The

plaintiffs' claims are subject to the familiar three-step burden-shifting framework set

forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

The first step of the McDonnell Douglas framework requires the plaintiffs to make

out a prima facie case of discrimination. To establish a prima facie case of disparate

---

[10] Although plaintiffs' Third Amended Complaint appears to bring a gender-based disparate treatment claim on
behalf of plaintiffs' LaRochelle, Vasquez, and Riker, Doc. No. 29 ¶ 22, the parties' subsequent briefing does not
address these claims. Instead, the parties' briefing regarding LaRochelle, Vasquez, and Riker is limited to their race
discrimination, retaliation, disability discrimination, wrongful discharge, and hostile work environment claims.
Because neither party has addressed LaRochelle, Vasquez, or Riker's gender-based disparate treatment claims,
clearly no reasonable factfinder could rationally conclude that there is a genuine issue of material fact as to these
claims. See Fed. R. Civ. P. 56(c); see also Sterling v. Redevelopment Auth., 836 F. Supp. 2d 251, 258 n.7 (E.D. Pa.
2011) (finding that certain claims had been abandoned at the summary judgment stage when plaintiff alleged the
claims in his complaint but then failed to address them in any subsequent briefing). Shearer is the only plaintiff
whose briefing addresses a gender-based disparate treatment claim.

treatment under Title VII, a plaintiff must establish that:  (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action despite being qualified; and (4) under circumstances that would raise an inference of discriminatory action, the employer continued to seek individuals with qualifications similar to the plaintiff's to fill the position.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). As an alternative to the fourth prong, a plaintiff may attempt to show that similarly situated individuals who are not members of the plaintiff's protected class were treated more favorably than the plaintiff. Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 273–74 (3d Cir. 2010); McNeil v. Greyhound Lines, Inc., 69 F. Supp. 3d 513, 522 (E.D. Pa. 2014). If the plaintiff makes out a prima facie case, then he effectively creates a presumption that the employer discriminated against him. McNeil, 69 F. Supp. 3d at 522.

Once the plaintiff successfully establishes a prima facie case, the burden then shifts to the employer who must "articulate a legitimate, non-discriminatory reason for its employment decision." Smith v. Borough of Wilkinsburg, 147 F.3d 272, 278 (3d Cir. 1998). At this stage, the employer's burden is "relatively light." Fuentes v. Perksie, 32 F.3d 759, 763 (3d Cir. 1994). As explained by the U.S. Supreme Court, the burden here is one of production rather than persuasion, thus involving no credibility assessment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes, 32 F.3d at 763. Provided the employer

articulates a legitimate non-discriminatory reason, the presumption of discrimination is eliminated. McNeil, 69 F. Supp. 3d at 522.

If an employer articulates a legitimate non-discriminatory reason for its employment decision, the third and final step under McDonnell Douglas requires the plaintiff to prove, by a preponderance of the evidence, that the articulated reason is simply pretext for discrimination. Smith, 147 F.3d at 278. At this final juncture, the plaintiff must come forth with "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. In order to raise disbelief under the first method of proof, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" sufficient to show that the employer's reason for termination was nondiscriminatory. Willis v. UPMC Children's Hosp., 808 F.3d 638, 644–45 (3d Cir. 2015). Pointing to evidence of the following will satisfy the second method of proof: (1) the defendant previously discriminated against the plaintiff; (2) discriminated against others within plaintiff's protected class; or (3) treated other similarly situated individuals outside plaintiff's class more favorably. Id. at 645.

### a.      *Shearer's Gender-Based Disparate Treatment Claim*

To establish a prima facie case of gender discrimination, Shearer must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action despite being qualified; and (4) under

circumstances that would raise an inference of discriminatory action, the employer

continued to seek individuals with qualifications similar to the plaintiff's to fill the

position. Sarullo, 352 F.3d at 797. Defendants do not dispute that plaintiff Shearer has

established the elements of a prima facie case.

### i.      Legitimate Non-Discriminatory Reason

Assuming Shearer has made out a prima facie case of gender discrimination,

Defendants must articulate a legitimate, non-discriminatory reason for its employment

decision. Smith, 147 F.3d at 278. Again, the burden at this stage is one of production

rather than ultimate persuasion. Reeves, 530 U.S. at 142. Defendants have set forth a

legitimate, non-discriminatory reason for its termination of Shearer. Defendants fired

Shearer following several documented incidents of alleged patient abuse. On May 23,

2011, Defendants suspended Shearer for three days after a resident at Lancashire Hall

reported that Shearer physically abused her. See Ex. D to Defs.' MSJ Regarding Shearer.

One month later, Shearer was again suspended for a separate report regarding a different

resident for allegedly misappropriating the resident's property. See Ex. F to Defs.' MSJ

Regarding Shearer. The third and final report of abuse, which came a few months later

(and eventually led to Shearer's termination) involved a Lancashire Hall resident's claim

that Shearer "talks to me like I'm a dog." Doc. No. 65-2[11] ¶ 22. Based on these incidents,

Defendants concluded that Shearer had violated Defendants' resident abuse policy and

fired her based on that. Defendants' Resident Abuse Policy states, in part: "It is the policy

of Wilmac Corporation that all residents residing in its facilities deserve to live in a safe

---

[11] Defs.' Concise Statement of Material Facts Regarding Pl. Shearer.

and protected environment from any form of verbal, mental, sexual or physical abuse."
Def.s' Ex. C. Hence, Defendants have met their burden of production.

### ii.  Pretext

To establish pretext, Shearer has two options. First, she may point to evidence that
Defendants' proffered reason is subject to such weaknesses and implausibilities sufficient
to satisfy the factfinder that Defendants' actions could not have been for
nondiscriminatory reasons. <u>Willis</u>, 808 F.3d at 644–45. Second, she may elect to point to
evidence leading a factfinder to reasonably believe that a discriminatory reason was more
likely than not a motivating or determinative factor in her termination. <u>Id.</u> at 645.

### 1.  *First Method of Proving Pretext*

Shearer has failed to show that her termination was pretext for gender
discrimination. Shearer does not argue that Defendants' proffered reason for termination
(patient abuse) is implausible or untrue. <u>See</u> Doc. No. 76-1[12] at pp. 12–14. Rather, she
challenges the veracity of Defendants' decision to suspend and terminate her for the
reports of patient abuse against her. She does this by pointing to her record in the
Pennsylvania Nurse Aide Registry, which indicates that she has no "substantiated"
findings of abuse, neglect or misappropriation. Ex. EE to Pl. Shearer's Resp. The parties
vigorously dispute whether or not the Pennsylvania Department of Health ("DOH") has
ever substantiated Defendants' reports of Shearer's abuse. Defendants contend that
plaintiffs have attempted to cloud the record and that evidence demonstrates that the
DOH has in fact substantiated abuse allegations against Shearer. However, Defendants'

---

[12] Pl. Shearer's Resp. in Opp. to Defs.' Mot. for Summ. Judg.

argument here is misplaced. The documents Defendants rely on are reflections of their own internal investigation and not the DOH's findings. For example, Defendants rely on a DOH Complaint Investigation Report. Ex. J to Defs.' MSJ Regarding Shearer. Under the section titled "Allegations," the DOH representative who filled out this report indicated that Defendants' finding per *their* investigation was "substantiated." Id. Defendants take this to mean that the DOH itself found the allegation to be substantiated. However, a close examination of the report proves otherwise. Specifically, on the last page of the report, the DOH recognized that Lancashire Hall had "substantiated" the allegations, but the DOH's recommendation was to not proceed further with the allegation against Shearer. Id. This, combined with the Pennsylvania Nurse Aide Registry record on Shearer, makes clear that the Pennsylvania DOH has no record of substantiated abuse findings. Ex. EE to Pl. Shearer's Resp.

The parties' disagreement over the term "substantiated" centers around a misunderstanding of the term as it relates to DOH findings of abuse versus findings of abuse per the Defendants' Resident Abuse Policy. A finding of "substantiated" by the Pennsylvania DOH is a formal term the Pennsylvania Department of Aging uses in finding that an elderly person is "in need of protected services."[13] On the other hand, a finding of "substantiated" by Defendants' is subject to their own internal policies, which may not necessarily rise to the level of abuse necessary to warrant a formal DOH finding. Ex. C to Defs.' MSJ Regarding Shearer. Plaintiffs' reliance on the fact that the

---

[13] See Pa. Dep't of Aging, *The Older Adults Protective Services Annual Report* (2013), http://www.aging.pa.gov/organization/advocacy-and-protection/Documents/OAPSA%20Report%20FY%202012-13.pdf.

Pennsylvania DOH has not "substantiated" any formal findings against Shearer misses the point. Plaintiffs' position relies on a premise that Defendants' legitimate non-discriminatory reason for firing Shearer (patient abuse) must be unbelievable or implausible simply because the DOH has not substantiated such allegations. As made clear by this circuit's precedent, that is not the case.

In Willis v. UPMC Children's Hospital, the Third Circuit addressed a similar dilemma at the "pretext" stage on a motion for summary judgment. 808 F.3d 638, 647 (3d Cir. 2015). There, the employer proffered a nondiscriminatory reason for firing the employee: the employee had been subject to three disciplinary incidents based on allegations of patient abuse, including the use of profanity. Willis, 808 F.3d at 641–42, 646–47. In response, plaintiff did not dispute violating the employer's policy, but nonetheless argued that the employer's reason was "riddled with inconsistencies" because she disagreed that her conduct warranted disciplinary action. Id. at 648. The Third Circuit affirmed the district court's finding that this was not sufficient evidence of pretext to defeat summary judgment. Id. at 648–49. Importantly, the court explained, "at the pretext stage it is not a court's role to "rul[e] on the strength of cause for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." Id. at 647 (alterations in original). Accordingly, it did not matter whether the employee's alleged use of profanity was actually heard by others; rather, it mattered whether the use of the profanity "was the reason" the employer disciplined the employee. Id. In arriving at its decision, the Third Circuit stressed that the relevant inquiry in this type of factual situation is whether the

employer's disciplinary actions were taken in furtherance of its own internal goals and policies. Id. at 647–48. Merely challenging the veracity of the employer's decision did not render it "unworthy of credence." Id. (quoting Fuentes, 32 F.3d at 765).

Likewise, here, it does not matter whether Shearer's allegations of abuse have been formally substantiated by the DOH for them to form the basis of her employer's decision to terminate her. The record is clear that Defendants relied on their Resident Abuse Policy, multiple times, in disciplining Shearer for patient abuse. To show pretext, Shearer must present evidence sufficient to lead a factfinder to believe that Defendants' reason is riddled with inconsistencies and contradictions. She does not do this. Rather, like the plaintiff in Willis, Shearer argues: "[a] reasonable jury could find for Plaintiff that she did not yell at the resident but acted appropriately . . . ." Doc. No. 76-1 at p. 13. The issue is not whether a juror could find that she acted appropriately but whether the Defendants' "did not in fact rely on its articulated reasons when terminating her employment." Willis, 808 F.3d at 647; see also  McNeil, 69 F. Supp. 3d at 524 ("[A]n employer may use statements and complaints by co-workers when making a decision to terminate an employee, and the employee cannot later establish pretext by simply challenging the veracity of such statements.") (internal quotation marks omitted); id. ("So long as the decision-maker reasonably credited the allegations, an employee's denial is not enough to establish pretext.") (quoting McCormick v. Allegheny Valley Sch., No. 063332, 2008 WL 355617, at *16 (E.D. Pa. Feb. 4, 2008)); Montgomery v. Pa. Airlines, 1994 WL 527455, at *6 n.10 (E.D. Pa. Sep. 22, 1994) ("[A] Title VII plaintiff must offer

evidence of pretext or discriminatory motives; evidence showing plaintiff's disagreement with the decision is insufficient.").

Shearer quotes Defendants' Resident Abuse Policy, which states that if allegations are not "substantiated," then the employee will be returned to work without consequence. Doc. No. 76-1 at p. 14 (citing Ex. C to Defs.' MSJ Regarding Shearer). According to Shearer, it follows that Defendants' proffered reason is implausible because the Pennsylvania DOH—not Defendants—failed to "substantiate" formal findings of abuse against Shearer. Id. This argument misunderstands the difference between an investigation between the DOH per the law and an investigation by Defendants per their abuse policy. Accepting plaintiff's position as true would mean that Shearer (or any employee) could defeat summary judgment simply by showing that a state agency did not enter formal findings of abuse against that employee. Clearly, such a position is not tenable. The record is clear that Defendants relied in good faith on their Resident Abuse Policy in deciding to terminate Shearer. The evidence Shearer points to, and the arguments she makes, are insufficient to create disbelief so that a factfinder could rationally find that Defendants did not rely on their proffered reasons in terminating Shearer.

## 2.    *Second Method of Proving Pretext*

In terms of the second method of proving pretext, Shearer does not offer any evidence to allow a factfinder to believe that her gender was "more likely than not a motivating or determinative cause" or Defendants' decision to terminate her. Willis, 808 F.3d at 645. Shearer does not point to evidence of other similarly situated men who were

treated differently than her. Doc. No. 76-1 at pp. 13–14. Nor does she present any evidence that she was terminated because she is a female. The sole allegation involving her gender is that her co-worker, Geib, would at times call her a "bitch." Ex. D to Pl. Shearer's Resp, Shearer Dep. at p. 122. Although a co-worker's name calling is certainly inappropriate, it does not create evidence showing that Defendants' decisionmakers fired Shearer because of her gender. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."). The record is devoid of evidence that could lead a factfinder to conclude that invidious discrimination based on Shearer's gender was "more likely than not a motivating or determinative cause" of Defendants' decision to terminate her.

The evidence in the record is insufficient to show that Defendants' reason for terminating Shearer was pretext for gender discrimination. Therefore, I will grant Defendants' motion for summary judgment on this claim.

### 2.    Hostile Work Environment

Sexual harassment is a type of discrimination that is prohibited by Title VII. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). The term "sexual harassment" embodies both quid pro quo harassment as well as claims for a hostile work environment. Id. at 65–67. To make out a claim for hostile work environment, a plaintiff must show that (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected

her; (4) the discrimination would have detrimentally affected a reasonable person of her sex in her position; and (5) respondeat superior liability exists. E.g., Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999).

In determining whether a plaintiff has sufficiently made out a claim, courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation omitted). Regarding the final element—respondeat superior—the Third Circuit has explained that the "basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a coworker." Huston v. Procter & Gamble Paper Prods., 568 F.3d 100, 104 (3d Cir. 2009). In cases where the alleged sexual harassment is done by a co-worker (not a supervisor) liability only attaches if the employer "failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Id.

### a.    *LaRochelle's Hostile Work Environment Claim*

LaRochelle's sex-based hostile work environment claim is premised upon allegations that her co-worker, Teddy Bernard, touched her inappropriately and made sexually inappropriate comments and advances to her. All these incidents allegedly

occurred in a three-and-a-half month time frame during LaRochelle's employ with Defendants. Defendants assert two bases for granting summary judgment on this claim. First, Defendants argue that the alleged harassment was not "severe or pervasive" enough to warrant liability. Second, Defendants contend that LaRochelle has failed to establish a genuine issue of material fact regarding the fifth element (respondeat superior liability) of her claim. Because I find vicarious liability inapplicable as a matter of law, Defendants' motion for summary judgment on this claim is granted.

As explained above, vicarious liability for a hostile work environment claim depends upon whether the alleged harasser is a supervisor or co-worker. Huston, 568 F.3d at 104. LaRochelle does not dispute that Bernard was her co-worker. Hence, Defendants can only be held liable for Bernard's alleged harassment if "there was no reasonable avenue for complaint or [they] knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 654 (E.D. Pa. 2012) (quoting Huston, 568 F.3d at 104). Defendants had a formal complaint procedure that was available and known to LaRochelle. Ex. Q to Defs.' MSJ Regarding Pl. LaRochelle. Thus, the remaining inquiry focuses on whether Defendants knew or should have known of the harassment and failed to take prompt and appropriate remedial action.

The evidence cited by LaRochelle demonstrates that LaRochelle made it known to her supervisors that she felt she was being harassed by Bernard Nonetheless, the evidence fails to show that Defendants failed to act promptly to adequately remediate the situation. LaRochelle's testimony indicates that she aired her complaints to several supervisors in

29

the month or two preceding her termination. Ex. D to LaRochelle's Resp. at pp. 20–50. Specifically, LaRochelle testified she gave a written statement to a supervisor. a few weeks prior to being terminated. Id. 39:3–17.  LaRochelle also notified Administrator, Michael Stuck, of Bernard's alleged harassment a few weeks prior to her termination. Id. 34:22–35:5. Stuck responded by telling LaRochelle that he would look into these allegations. Id. Thus, it is clear that LaRochelle's complaints in mid-September sparked an investigation into Bernard by the Defendants.

The dispositive issue with LaRochelle's claim is that the investigation into Bernard was not yet completed at the time LaRochelle was terminated and, thus, appropriate remedial action could not possibly have been taken. See Knabe v. Boury Corp., 114 F.3d 407, 412 (3d. Cir. 1997) ("Even if a company's investigation into complaints of sexual harassment is lacking, the employer cannot be held liable for the hostile work environment created by an employee under a negligence theory of liability unless the remedial action taken subsequent to the investigation is also lacking."); Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 654 (E.D. Pa. 2012) (granting summary judgment because the employer took prompt and appropriate remedial action even assuming the alleged harasser's conduct was severe and pervasive). In other words, it is not enough for LaRochelle to argue that Defendants' investigation was lacking. Knabe, 114 F.3d at 412. Rather, LaRochelle must demonstrate that the actual remedial action "subsequent to" the investigation was lacking. Id.

In the same vein, no reasonable factfinder could conclude that Defendants failed to act promptly when they were only given notice of LaRochelle's allegations a few weeks

30

prior to her termination.[14] This is the case even if LaRochelle's allegations (that Bernard subjected her to unwelcome touching and comments) were severe and pervasive. Miller, 908 F. Supp. 2d at 654. The fact that LaRochelle ceased working at Lancashire Hall obviated Defendants' need to take any action to prevent further harassment of LaRochelle because, obviously, LaRochelle no longer worked there. See id. (noting that, in determining whether remedial action was adequate, courts consider whether the action was "reasonably calculated to prevent further harassment"). Nonetheless, the evidence shows that Defendants did in fact continue their investigation of Bernard's sexual harassment in the months following LaRochelle's termination. See Ex. L to Defs.' MSJ Regarding LaRochelle. This investigation included numerous witness statements and ultimately led to Bernard's termination. Id.; Ex. N to Defs.' MSJ Regarding LaRochelle. Simply because the investigation into Bernard's alleged harassment did not conclude in one or two weeks does not make the Defendants' subsequent actions lacking. Simply put, no reasonable jury could conclude that Defendants failed to take prompt and appropriate remedial action with respect to LaRochelle.

Therefore, I will grant Defendants' motion for summary judgment on LaRochelle's sex-based hostile work environment claim.

### b.       *Riker's Hostile Work Environment Claim*

Plaintiff Riker also brings a gender-based hostile work environment claim. Defendants are entitled to summary judgment as to Riker's gender-based hostile work

---

[14] To the extent that plaintiffs claim LaRochelle's termination was unlawful, those allegations are addressed below in the analysis of LaRochelle's retaliation and wrongful discharge claims.

environment claims because: (1) the alleged discrimination was not sufficiently severe or pervasive to impose liability, and (2) there can be no respondeat superior liability.

Riker was employed at Lancashire Hall for nearly three years—from May 2009 to January 2012.  Doc. No. 85-1[15] at pp. 6, 14. Within this time period, Riker points to an incident where co-worker, Bernard, came up from behind her and rubbed her on her shoulders. Id. at 6. According to Riker, she reported this incident to her supervisors, but she does not indicate when this was reported. Id. Riker contends that she reported Bernard in June 2010 because he would yell and scream at her. Doc. No. 85-4 ¶ 4. On June 23, 2011, Riker made a report to her supervisors that Bernard had hugged her from behind and made a comment to her. Doc. No. 66-2 ¶ 4. One week later, Defendants launched an investigation into Bernard's conduct, which resulted in Bernard's suspension. Id. ¶¶ 10–14. One week after that, on July 6, 2011, Defendants terminated Bernard Id. ¶ 16.[16]

Viewing the facts in a light most favorable to Riker, there is insufficient evidence to create a triable issue as to two of the five required elements in a hostile work environment claim. The complained of conduct, as a matter of law, fails to rise to the level of "severe or pervasive" harassment. Regarding the "severe and pervasive" element, Riker has at best established sporadic and isolated incidents of harassment. The two

---

[15] Pl. Riker's Memo. in Support of Resp. in Opp. to Summ. Judg.

[16] Plaintiffs' arguments concerning Riker's hostile work environment claims consists mostly of vague reiterations that she "reported sexual harassment," but often do not contain details or specific facts regarding the alleged sexual harassment. Almost always, Riker's claims are unsupported by citation to evidence of record. The court is only bound to consider facts that are supported by citation to "particular parts of materials in the record." Fed. R. Civ. P. 56(c). Even under a liberal reading of Rule 56, the only specific instances of Riker's alleged sexual harassment are those listed above.

specific incidents she cites (the shoulder rubbing and the hug) occurred over a nearly three-year period. See Rosati v. Colello, 94 F. Supp. 3d 704, 716 (E.D. Pa. 2015) (finding that three specific incidents over a four-month period "is not a continuous period of harassment"); Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439–40 (E.D. Pa. 2001) (granting summary judgment on hostile work environment claim because four incidents over a period of a year and a half are insufficient evidence of a hostile work environment); Funayama v. Nichia America Corp., Civ. Action No. 08-5599, 2011 WL 1399844, at *13 (E.D. Pa. April 13, 2011) (finding that co-worker's asking plaintiff out on dates, touching her side, and making comments about her body over four-year period was not sufficiently severe or pervasive). Over the years she was employed at Lancashire Hall, the unwelcome hug and rubbing of Riker's shoulders was undoubtedly crass and unwelcome, but that does not necessarily make the Defendants liable. While being "yelled at" by Bernard may be unpleasant, these types of allegations, without reference to her gender, do not support a gender-based hostile work environment claim. See Hegyes v. U.S. Steel Corp., No. 2:04CV1283, 2007 WL 218711, at * (W.D. Pa. Jan. 25, 2007) (granting summary judgment on female plaintiff's Title VII hostile work environment claim when the alleged harassers did not "refer to plaintiff's  gender in the process of cursing, yelling or screaming at her").  Moreover, Riker is often unable to identify even approximate dates for the alleged incidents. See Shesko v. City of Coatesville, 292 F. Supp. 2d 719, 726 (E.D. Pa. 2003) (granting summary judgment on sex-based hostile work environment claim in part because of plaintiff's inability to identify "even approximate dates of the alleged comments, and in some instances . . . the year"). In the

totality of the circumstances, the isolated instances Riker refers to do not rise to the level of severe or pervasive conduct needed to maintain a hostile work environment claim.

Even assuming Bernard's conduct toward Riker was severe and pervasive, Riker's hostile work environment claim fails because there is no genuine issue of fact regarding the fifth element: respondeat superior liability. Riker alleges that she was harassed by Bernard, who is a co-worker rather than a supervisor. Because Bernard is not a supervisor, Defendants can only be held vicariously liable if they "failed to provide a reasonable avenue for complaint or, alternatively, if [they] knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston, 568 F.3d at 104. It is undisputed that Riker wrote her supervisor a note, on June 23, 2011, indicating Bernard had hugged her and made comments to her. See Doc. No. 66-2 ¶ 4 (citing Ex. E). It is also undisputed that a week later Defendants suspended Bernard, following an investigation into the hugging incident, for violating company policy. Id. ¶ 14 (citing Ex. H). A week after Bernard's suspension, he was fired. Id. ¶ 16 (citing Ex. J). Although Riker claims she complained earlier about Bernard's alleged harassment of others, the only evidence adduced shows that June 23, 2011 is the first time Riker actually complained that Bernard had personally harassed her. In response to this complaint, Defendants investigated Riker's allegations about Bernard, gathered witness statements, suspended Bernard, and fired Bernard, all within two weeks. As such, Defendants cannot be held vicariously liable because they took prompt and appropriate remedial action.

For these reasons, I will grant Defendants' motion regarding Riker's gender-based hostile work environment claim.

### c.    Shearer's Hostile Work Environment Claim

Plaintiffs argue that "[s]ubstantial evidence was presented that . . . Defendants tolerated unabated severe and pervasive harassment against Plaintiff Shearer on the basis of her . . . sex." Doc. No. 76-1 at p. 3.[17] However, plaintiffs do not point to any evidence of Bernard's alleged sexual harassment of her. Without citation to the record, plaintiffs claim that "the sexual harassment was tolerated." Id. at p. 7. Defendants maintain that Shearer's gender-based hostile work environment claim must fail based primarily on Shearer's testimony. Specifically, Defendants point to Shearer's deposition testimony in which Shearer was asked whether or not Bernard ever sexually harassed her. Doc No. 90 at p. 4. In response to this question, Shearer stated: "No, he didn't". Id. (citing Shearer Dep. at p. 152).

In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), the U.S. Supreme Court expounded upon the requirements of a successful hostile work environment claim. There, the court explained: "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Harris, 510 U.S. at 21–22; see also Petril v. Cheyney Univ. of Pa., 789 F. Supp. 2d 574, 579 (E.D. Pa. 2011) (noting that in Harris "the Supreme Court explained that a hostile work environment is actionable when the harassing conduct is both objectively hostile, as perceived by a reasonable person, and

---

[17] Plaintiff Shearer does not cite to, or explain, precisely what evidence she refers to here.

subjectively hostile, as perceived by the plaintiff herself"). Certainly, no reasonable jury could find that Shearer subjectively perceived Bernard harassed her when Shearer herself testified that Bernard had never sexually harassed her. See Minning v. PNC Bank, 2008 WL 4083007, at *4–6 (E.D. Pa. Aug. 28, 2008) (granting summary judgment on hostile work environment claim when plaintiff "admitted during her deposition testimony that [the alleged harasser] did not harass her"). Shearer's testimony that she was never sexually harassed eliminates any genuine issue of material fact as to her gender-based hostile work environment claims.

Although Shearer also claims that Geib and Leitoro sexually harassed her, Shearer does not point to any specific incident of sexual harassment nor does she provide any factual allegations to support her claim that they sexually harassed her. Shearer's sexual harassment claims against Geib and Leitoro cannot survive summary judgment on conclusory allegations alone. In the context of employment discrimination claims, "conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment." Taylor v. Cherry Hill Bd. of Educ., 85 F. App'x 836, 839 (3d Cir. 2004); Shesko, 292 F. Supp. 2d at 726. Accordingly, I will grant summary judgment for the Defendants on this claim.

### d. *Vasquez's Hostile Work Environment Claim*

Defendants make several arguments in support of their motion for summary judgment on Vasquez's gender-based hostile work environment claim, including that the

claim is time-barred. Doc. No. 67-1[18] at p. 6. I will grant Defendants' motion because I

find that Vasquez's gender-based hostile work environment claim is time-barred.

      To bring suit under Title VII in a deferral state, such as Pennsylvania, a plaintiff

must first file a charge with the EEOC within 300 days of the alleged unlawful

employment practice. 42 U.S.C. § 2000e-5(e)(1). Ordinarily, discrete acts of

discrimination are not actionable if time barred, even when they relate to acts in a timely

filed EEOC charge. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir.

2013). However, timeliness is analyzed differently when the claim is one for hostile work

environment. Id. at 165–66. "[C]ourt[s] may consider [the] 'entire scope of a hostile work

environment claim . . . so long as any act contributing to that hostile environment takes

place within the statutory time period." Id. at 165 (quoting Nat'l R.R. Passenger Corp. v.

Morgan, 536 U.S. 101, 105 (2002)). This is because a "hostile work environment claim is

composed of a series of separate acts that collectively constitute one unlawful

employment practice and cannot be said to occur on any particular day." Id. (internal

quotation marks omitted).

      Viewing the evidence in a light most favorable to Vasquez, her present claim is

barred because she is unable to present evidence of a single incident of sexual harassment

that occurred within the limitations period.[19] Vasquez filed her EEOC charge on April 13,

---

[18] Defs.' Memo. of Law in Support Mot. for Summ. Judg. Regarding Pl. Vasquez.

[19] Plaintiffs' briefing regarding Bernard's and Leitoro's alleged harassment of Vasquez presents the dilemma of a "sham" affidavit. "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). A sham affidavit does not raise a genuine issue of material fact at the summary judgment stage "because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." Id. After Defendants raised the time-bar

2012. Doc. No. 67-2 (citing Ex. J, Vasquez's EEOC Charge). Thus, in order for her

hostile work environment claim to be timely, Vasquez must come forth with evidence

that at least one of the alleged incidents occurred within 300 days of this date (i.e. after

June 13, 2011). Mandel, 706 F.3d at 165. Vasquez alleges a co-worker made a comment

about her breast-reduction surgery in 2009. Doc. No. 67-2 ¶ 35. Following this incident,

Vasquez claims she began to be harassed by Bernard when he was hired in June 2010.

Without citation to the record, Vasquez argues that Bernard's harassment continued

unabated through 2011. The record evidence tells another story. Vasquez herself testified

that Bernard's harassment ceased after "a few months" following his hiring in June 2010.

Doc. No. 91 at p. 6 (quoting Vasquez Dep. (Day 2) 38–39). When asked to specify how

long, Vasquez said it went on for "four or five" months. See Pl. Vasquez's Ex. I, Vasquez

Dep. 82:20–24. Viewing Vasquez's testimony in a light most favorable to her, the latest

an incident involving Bernard may have occurred is in November 2010. This would have

been over six months before June 13, 2011. Vasquez claims she was harassed by another

co-worker, Leitoro, "on a continuing basis from 2010 through Leitoro's last day of

employment" on September 16, 2012." Doc. No. 77-1 ¶ 27. However, none of the

evidence cited supports this allegation. Id. [20]  It is clear from the record that Vasquez is

---

argument in their motion for summary judgment on Vasquez's claims, Vasquez submitted an entirely new affidavit in which she alleges Bernard's harassment continued until 2011 when Bernard was fired. See Ex. A, Pl. Vasquez's Resp. in Opp. Defs.' Mot. Summ. Judg. This affidavit is in direct contradiction to Vasquez's deposition testimony in which she admitted Bernard's conduct ceased in mid-2010. Therefore, this is clearly a "sham" affidavit and will not be considered as evidence. Nor will the court consider other "sham" affidavits offered by the plaintiffs to attempt to create a genuine issue of material fact. Jiminez, 503 F.3d at 253.

[20] Aside from sham affidavits, plaintiffs have muddied the waters on this issue through misrepresentation of the record evidence. For example, in plaintiffs' Statement of Undisputed Facts, they allege: "January 2012, Plaintiff [Vasquez] reduced her work hours to part-time to limit her contact and harassment by Leitoro" Doc. No. 77-1 ¶ 28.

unable to point to an incident that occurred within the applicable limitations period. Hence, her claim is time-barred.

Even if Vasquez's sexual harassment allegations against Bernard and Leitoro are not time-barred, they still would be insufficient to support her hostile work environment claim as Vasquez has not, as a matter of law, produced evidence sufficient to support her contention that Bernard and Leitoro's actions were severe or pervasive. Beginning with her allegations against Bernard, Vasquez fails to present evidence indicating the frequency with which she suffered Bernard's propositions for dates and sex, and unwelcome touches. In other words, there is no evidence regarding whether this harassment occurred daily, weekly or monthly as would support a characterization of Bernard's harassment as pervasive. Although Bernard's physical touching of her person was certainly inappropriate, it is not sufficiently severe enough to satisfy the second prong of Vasquez's prima facie case even when coupled with Bernard's comments. See e.g., McGraw v. Wyeth-Ayerst Laboratories, Inc., No. 1997 WL 799437, *6 (E.D. Pa. Dec. 30, 1997) (determining that supervisor's repeated requests for dates in conjunction with kissing her and "forcing his tongue into her mouth" is not severe and pervasive); Jankowski v. Sage Corp., No. 08-770, 2010 WL 1253544, at *8 (E.D. Pa. Feb. 23, 2010) (holding that a supervisor twice placing his hands on plaintiff's shoulder and back and

---

In support of this statement, plaintiffs cite only to Vasquez's Responses to Interrogatories. Id. However, upon review of the Responses to Interrogatories, nowhere does it state that Vasquez reduced her work hours to part-time because of Leitoro's harassment. Doc. No. 81-7. Id. Similarly, plaintiffs rely on Leitoro's "termination slip" in stating that Vasquez was harassed by Leitoro "on a continuous basis from 2010 through Leitoro's last day of employment [September 16, 2012]." Doc. No. 77-1 ¶ 27. However, this "termination slip" does not establish that Leitoro harassed Vasquez in any way. See Ex. AA to Pl. Vasquez's SOF. All the termination slip establishes is that Leitoro's last day of work at Lancashire Hall was on September 16, 2012.

rubbing, four instances of brushing up against plaintiff and comments does not constitute severe and pervasive harassment); Saidu-Kamara, 155 F.Supp.2d at 439–41 (not severe or pervasive where plaintiff's supervisor patted employee on buttocks and breast on one occasion and propositioned her on several occasions);  Swanson v. Nw. Human Servs., Inc., No. 05-3054, 2006 WL 3354145, *3 (E.D. Pa. Nov. 30, 2006) (holding that a supervisor's harassment was not severe or pervasive when supervisor told plaintiff he looked good in jeans, grabbed his buttocks on one occasion and asked him out on dates). While Vasquez claims that Bernard's harassment affected her ability to perform her job, she does not point to any particular ill effects that Bernard's harassment on her job performance.

Vasquez's allegations against Leitoro are even less indicative than those against Bernard.  Vasquez's allegation against Leitoro rests solely on the fact that he flirted with her and asked her on dates, and when she rejected his advances, Leitoro yelled at her while working with a resident.  Like her allegations against Bernard, Vasquez does not provide evidence as to how frequent Leitoro's advances were as would support a characterization of Leitoro's advances as pervasive.  Moreover, Vasquez does not allege that Leitoro physically touched her or that she felt physically threatened.  Leitoro's harassment consisted solely of mere offensive utterances.  Furthermore, despite claims that she reduced her work hours to part-time in order to avoid contact with Leitoro, the record does not support this claim.  Vasquez testified that her decision to go part-time was because "[she] was thinking about going back to school and in order to focus on that, [she] would have to go part-time."  Pl. Vasquez's Ex. I, Vasquez Dep. Day I 37:16-21.

Based on the foregoing, I will grant Defendants' motion for summary judgment with respect to Vasquez's gender-based hostile work environment claim.

### B.     Race and Ethnic Discrimination Under Title VII and Section 1981

The plaintiffs have brought three types of racial discrimination claims pursuant to Title VII, Section 1981, and the PHRA. First, some of the plaintiffs bring disparate treatment claims based on race and national origin. Second, some plaintiffs bring race-based and national origin-based hostile work environment claims. Third, plaintiff Riker brings an associational race discrimination claim.

### 1.     Disparate Treatment

The plaintiffs' race-based and national origin disparate treatment claims are analyzed under the same <u>McDonnell Douglas</u> framework set forth above in addressing the gender-based disparate treatment claims.

### a.     LaRochelle's Race-Based Disparate Treatment Claim

Plaintiff LaRochelle brings a race-based disparate treatment claim under Title VII. Doc. No. 29 ¶¶ 22, 28. Defendants have moved for summary judgment on all of LaRochelle's Title VII race discrimination claims, arguing that LaRochelle failed to exhaust her administrative remedies. I agree with Defendants. Therefore, summary judgment is granted with respect to LaRochelle's race-based disparate treatment claim.

### i.     Title VII

Unlike claims under Section 1981, discrimination claims under Title VII are subject to several jurisdictional prerequisites including a requirement that the plaintiff exhaust their administrative remedies.  <u>See</u> <u>Gooding v. Warner-Lambert Co.</u>, 744 F.2d

41

354, 359 (1984) ("The filing of a Title VII charge and resort to Title VII's administrative machinery are not a prerequisite for maintaining a section 1981 suit.") (citing Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460 (1975)).  The administrative exhaustion requirement for a Title VII claim demands that a plaintiff file charges with the EEOC within 180 days of the alleged discriminatory act.  Joyner v. School Dist. of Phila., 313 F.Supp.2d 495, 500 (E.D. Pa. 2004).   After filing their charge with the EEOC, the plaintiff will receive a "right to sue" letter from that body before filing suit.  Schouten v. CSX Transp., Inc., 58 F.Supp.2d 614, 616 (E.D. Pa. 1999) (citations omitted).  The administrative exhaustion requirement "is tempered by a fairly liberal construction given to EEOC charges.  Id.  For example, "the failure to check a particular box on an EEOC charge. . . is not necessarily indicative of a failure to exhaust the mandatory administrative remedies.  Id.  Rather, the touchstone for whether a plaintiff has properly exhausted his administrative remedies is whether "the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior E.E.O.C. complaint, or the investigation arising therefrom."  Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (citing Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)).

On LaRochelle's initial EEOC notice of charge of discrimination, LaRochelle checked only the box "sex" to indicate the basis of her Title VII claim. See Ex. I to Defs.' MSJ Regarding LaRochelle. Subsequently, on her actual EEOC charge of discrimination, LaRochelle checked the boxes for sex, age and retaliation.  See Ex. O to Defs.' MSJ Regarding LaRochelle. LaRochelle did not check the box for race; however, that is not fatal to her current Title VII or PHRA claim for race discrimination.  What is fatal to her

Title VII and PHRA claim is that LaRochelle's EEOC charge of discrimination provides no indication that she suffered racial discrimination.  Id. The only claims that might reasonably arise from LaRochelle's description are an age discrimination, sex discrimination and retaliation claim.  Id. LaRochelle's failure to provide any indication whatsoever, in her EEOC notice and EEOC charge, that she suffered racial discrimination means that she has not properly exhausted her administrative remedies on her Title VII discrimination claims.  Therefore, I will grant summary judgment on her Title VII and PHRA race-based disparate treatment claims.

### ii.      Section 1981

Unlike Title VII, Section 1981 is not subject to any jurisdictional prerequisites such as the EEOC filings. The Defendants move for summary judgment on LaRochelle's racial discrimination claim on the grounds that LaRochelle failed to establish a *prima facie* case of race discrimination.  The evidence shows that LaRochelle has failed to establish the fourth prong of a prima facie case—that her she was terminated under circumstances giving rise to an inference of race discrimination.

LaRochelle alleges that Baron Geib repeatedly referred her to as "House Nigger" and said to her that "he was going to request that Plaintiff work on his wing whenever present in the building because Plaintiff did not talk 'Ghetto' like every other 'Nigger' there."  Pl. LaRochelle Resp. at p. 11. LaRochelle states that she reported Geib's racially derogatory slurs to a supervisor but nothing was done in response.  Id.  Based on these statements, LaRochelle claims that Geib "treated [her] differently and disparately because of her race.  He subjected her to unbridled disrespect and control over her as his 'House

Nigger.'  Obviously Plaintiff LaRochelle was treated less favorably than her similarly situated [white] co-workers performing duties as a certified nurse aid."  Id. at 19.

Under McDonnell Douglas, a plaintiff seeking to establish a race discrimination claim must demonstrate that she suffered an adverse employment action by showing that she was subject to a "significant change in employment status."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  An adverse employment action includes "all tangible employment actions 'such as hiring, firing, failing to promote, reassignment or a decision causing significant change in benefits."  Sherrod v. Phila. Gas Works, 57 F. App'x 68, 73 (3d Cir. 2003) (quoting Burlington, 524 U.S. at 761).  LaRochelle cannot establish an adverse employment action on the basis of Geib's racially derogatory comments alone.  Rosati v. Colello, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015) ("Unnecessary derogatory comments do not rise to the level of adverse employment actions.").  Geib's comments do not constitute a "decision causing [a] significant change in benefits."  Id.  In fact, Geib's comments had no material alteration on the terms and/or conditions of her employment and LaRochelle herself testifies to that effect.[21] LaRochelle Dep. 55:17-22; Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) ("[A]n adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.")(citations omitted).  Geib's racially derogatory comments are insufficient as a matter of law to state a *prima facie* case of race discrimination.

---

[21] To the extent that LaRochelle argues that Geib's racially derogatory comments and her termination were linked, the presented evidence fails to support such a causal connection. Geib is not a supervisor, has no authority to make any employment decisions on behalf of LaRochelle and LaRochelle does not allege or provide any evidence that Geib played any role in her termination.

On October 1, 2010, Lancashire Hall terminated LaRochelle's employment. Certainly, LaRochelle's termination constitutes an adverse employment action for purposes of her racial discrimination claims.[22]   However, LaRochelle does not allege that there was a causal nexus between her termination and her race.  LaRochelle does not provide evidence of a racially discriminatory animus on the part of any of the decisionmakers in her termination or allege that similarly situated employees who were not members of her protected class were treated differently.  Simply put, LaRochelle does not provide evidence that Defendants' decisionmakers terminated her because of her race. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

Therefore, I will grant Defendants' motion for summary judgment on LaRochelle's race-based disparate treatment claim under Section 1981.

### b.      *Shearer's National Origin Disparate Treatment Claim*

The plaintiffs' complaint alleges that Shearer was subject to discrimination and disparate treatment on the basis of her national origin. Defendants do not dispute that plaintiff Shearer has established the elements of a prima facie case. Hence, our inquiry is limited to whether Defendants have proffered a legitimate, non-discriminatory reason and, if so, whether Shearer has established pretext.

---

[22] LaRochelle does not claim that her termination was done on the basis of her race, but she does allege that her termination was in retaliation for reporting racial harassment. These allegations are addressed in her retaliation claim.

45

### 1.      Legitimate Non-Discriminatory Reason

Assuming Shearer has made out a prima facie case of national origin

discrimination, Defendants must articulate a legitimate, non-discriminatory reason for its

employment decision. <u>Smith</u>, 147 F.3d at 278. Again, the burden at this stage is one of

production rather than ultimate persuasion. <u>Reeves</u>, 530 U.S. at 142. As previously

discussed in addressing Shearer's gender-based disparate treatment claim, Defendants

have set forth a legitimate, non-discriminatory reason for its termination of Shearer:

patient abuse in violation of the Defendants' Resident Abuse Policy. Thus, the burden

shifts to Shearer to establish that Defendants' proffered reason was truly pretext for

discrimination based on her national origin.

### 2.      Pretext

To establish pretext, Shearer has two options. First, she may point to evidence that

Defendants' proffered reason is subject to such weaknesses and implausibilities sufficient

to satisfy the factfinder that Defendants' actions could not have been for

nondiscriminatory reasons. <u>Willis</u>, 808 F.3d at 644–45. Second, she may elect to point to

evidence leading a factfinder to reasonably believe that a discriminatory reason was more

likely than not a motivating or determinative factor in her termination. <u>Id.</u> at 645.

### i.      *First Method of Proving Pretext*

Shearer renews the same pretext argument she made with respect to her gender-

based disparate claims addressed above. Shearer insists that the allegations of abuse

against her were not "substantiated" by the Pennsylvania DOH and that her conduct did

not warrant termination under Defendants' Resident Abuse Policy. For the same reasons

46

previously discussed, Shearer's arguments under the first method of proving pretext are
unavailing. I will now address whether any evidence supports Shearer's pretext argument
under the second method of proving pretext. <u>Willis</u>, 808 F.3d at 645.

### ii.        *Second Method of Proving Pretext*

In terms of the second method of proving pretext, Shearer does not offer any
evidence to allow a factfinder to believe that her national origin was "more likely than
not a motivating or determinative cause" of Defendants' decision to terminate her. <u>Willis</u>,
808 F.3d at 645. Shearer does not point to other similarly situated non-Hungarian
employees who were treated differently than her. Doc. No. 76-1 at pp. 13–14. Nor does
she present any evidence that she was terminated because of her Hungarian ethnicity.
Shearer testified that a co-worker, Geib, called her a "stupid immigrant" and that she
should go back to where she came from. Ex. D to Pl. Shearer's Resp, Shearer Dep. at p.
123. Another co-worker admitted hearing Geib make comments about "immigrants," but
not directly to Shearer. Ex. H to Pl. Shearer's Resp., Santiago Dep. 46:16–18.[23] Although
a co-worker's name calling is certainly inappropriate, it does not create evidence showing
that Defendants' decisionmakers fired Shearer because of her gender. <u>Hazen Paper Co. v.
Biggins</u>, 507 U.S. 604, 610 (1993) ("Whatever the employer's decisionmaking process, a
disparate treatment claim cannot succeed unless the employee's protected trait actually
played a role in that process and had a determinative influence on the outcome."). The
record is devoid of evidence that could lead a factfinder to conclude that invidious

---

[23] Geib was ultimately terminated by Defendants on January 3, 2012. Ex. QQ to Pl. Shearer's Resp.

discrimination based on Shearer's national origin was "more likely than not a motivating or determinative cause" of Defendants' decision to terminate her.

The evidence in the record is insufficient to show that Defendants' reason for terminating Shearer was pretext for national origin discrimination. Therefore, I will grant Defendants' motion for summary judgment on this claim.

### c.    Vasquez's Race-Based Disparate Treatment Claim

Vasquez asserts a disparate treatment claim, arguing she was terminated because she is Hispanic. Viewing the evidence in a light most favorable to Vasquez, she has failed to make out a prima facie case of race discrimination. Even if she had, though, Vasquez fails to meet its burden of showing that Defendants' legitimate, non-discriminatory reason for firing her was pretext. Therefore, I will grant summary judgment on Vasquez's race-based disparate treatment claim.

Vasquez can easily meet the first three elements of a prima facie case of race discrimination. First, Vasquez is a member of a protected class because she is Hispanic. Doc. No. 67-2 ¶ 2. Second, there is sufficient evidence indicating Vasquez was qualified for the nursing position. Third, Vasquez suffered an adverse employment decision when Defendants terminated her in August of 2013. Id. ¶ 5. However, Vasquez is unable to bring forth evidence that her termination occurred under circumstances giving rise to an inference of intentional discrimination. Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013).

To meet this fourth element, Vasquez must either: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same

protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." Id. Vasquez insists she was called a "spic" by a co-worker, Geib, who told her to "go back home to her people." Doc. No. 78 at p. 9. According to Vasquez, Geib also told her she was not "good enough" to live in the United States. Id. To be sure, these comments are extremely rude and racially charged. However, Geib is the only co-worker Vasquez alleges made racist remarks to her. Id. It is undisputed that Geib was terminated on January 13, 2012—nearly two years before Vasquez's termination. Doc. No. 67-2 ¶¶ 3, 37. No reasonable factfinder could conclude the decision to terminate Vasquez was motivated by racial animus when the only person who allegedly made racial comments was a co-worker who had been terminated for nearly two years at the time of Vasquez's termination. Even viewing the evidence in a light most favorable to Vasquez, there is no "causal nexus" between her race and her termination. Burton, 707 F.3d at 426. Nor has Vasquez introduced any evidence of comparators (i.e. non-Hispanics who were treated more favorably than Vasquez under similar circumstances). Consequently, Vasquez has failed to make out a prima facie case of race discrimination.

Even if she could make out a prima facie case, Vasquez is unable to rebut Defendants' legitimate, non-discriminatory reason for terminating Vasquez: Vasquez allegedly failed to show up for the three shifts required by her employment contract with Defendants. Doc. No. 67-2 ¶¶ 41–45. Although Vasquez disagrees with the details of Defendants' proffered legitimate non-discriminatory reason, the burden at this stage is

49

"relatively light" and involves no credibility assessment. Reeves, 530 U.S. at 142;

Fuentes, 32 F.3d at 763. Even assuming Vasquez is correct in her criticism of

Defendants' decision to terminate her, there is no evidence that this decision was

motivated in any way by racial animus.[24] Again, Geib (the sole employee accused of

racial discrimination by Vasquez) had not worked at Lancashire Hall for nearly two years

at the time Defendants decided to terminate her. Hence, Vasquez is unable to show

pretext.

Based on the foregoing, I will grant Defendants' motion for summary judgment on

Vasquez's race-based disparate treatment claim.

### 2.    Associational Race Discrimination

Plaintiff Riker, who is Caucasian, claims that she was subjected to unlawful

discrimination because of her "association with co-workers of race, color and ancestry for

whom she reported discrimination complaints on their behalf."  Doc. No. 29 ¶ 56.  It is

true that federal courts have recognized claims for associational discrimination under

Title VII.  Zielonka v. Temple Univ., No. 99-5693, 2001 WL 1231746, *5 (E.D. Pa. Oct.

12, 2001). However, those same courts have limited associational discrimination claims

under Title VII to causes of action which "involved more substantial relationships."  Id.;

Baker v. Wilmington Trust Co., 320 F.Supp.2d 196, 203 (D. Del. 2004) ("[T]he courts

have recognized that associational discrimination claims must have as their basis a much

more significant relationship."); compare Parr v. Woodmen of the World Life Ins. Co.,

---

[24] To the extent that Vasquez's termination was motivated by her filing of an EEOC charge and lawsuit against
Defendants, those issues are addressed below in the analysis of Vasquez's retaliation claim.

791 F.2d 888, 892 (11th Cir. 1986) (interracial marriage), <u>Chacon v. Ochs</u>, 780 F. Supp.

680, 682 (C.D. Ca. 1991) (interracial marriage), <u>Gresham v. Waffle House, Inc.</u>, 586 F.

Supp. 1442, 1445 (N.D. Ga. 1984) (interracial marriage), <u>Holiday v. Belle's Rest.</u>, 409 F.

Supp. 904, 908 (W.D. Pa. 1976) (interracial marriage), <u>with</u> <u>Robinett v. First Nat'l Bank</u>

<u>of Wichita</u>, 1989 WL 21158, *1–2 (D. Kan. Feb. 1, 1989) (finding "good friendship" of

white plaintiff with black co-worker "insufficient to establish the type of relationship"

necessary to support cause of action).  There is no spousal or familial relationship

between Riker and the persons of a protected class.  Rather, Riker and the persons of a

protected class are co-workers and courts have not found that the relationship between

co-workers is a "substantial relationship" as would give rise to an associational

discrimination claim.  Accordingly, I will grant the Defendants' motion for summary

judgment on this claim.

### 3.    Hostile Work Environment

Plaintiffs Vasquez and LaRochelle bring race-based hostile work environment

claims. Plaintiff Shearer brings a hostile work environment claim based on national

origin.[25]

### a.    *Shearer's National Origin Claim*

Shearer claims that she "was the target of ongoing harassment, hatred and ridicule

because of her Hunagarian/Romanian nationality that included her speech and manner of

speech."  Doc. No. 82, Att. 1, 3.  Shearer cites to several incidents in support of her

---

[25] The legal framework for deciding hostile work environment claims set forth previously in this opinion applies equally and identically here.

national origin claim including:  (1) co-worker M.M. refused to work with her because of her nationality and ridiculed the way she spoke English; (2) Geib repeatedly called her a "stupid immigrant" and a "bitch;" (3) Geib stated that "all aliens should be made to return to their countries; (4) L.N. tolerated Geib's discriminatory comments, assigned Shearer the more difficult and heavier residents, accused her of faking her injuries, and dumped Shearer's purse into the soiled linen cart; (5) Geib instructed co-workers not to work with Shearer; and (6) Geib stated to Shearer that "if I was your husband, I would beat the crap out of you." Doc. No. 76, Att. 2, ¶¶ 4,7.

Even taken as a whole, these comments and isolated incidents do not rise to the level of severity or pervasiveness necessary to sustain a hostile work environment claim. Although M.M.'s mocking of Shearer's accent and Geib's derogatory comments are tied to Shearer's national origin, it is not clear that M.M.'s refusal to work with Shearer, Geib's statement that "if I was your husband, I would beat the crap out of you," and L.N.s behavior was rooted in any discriminatory animus towards Shearer based on her national origin.  Certainly, facially neutral mistreatment may often conceal a more sophisticated and subtle form of discrimination; however, Shearer has presented no additional evidence to indicate that M.M.'s refusal to work with her, this particular comment from Geib, or L.N.'s behavior concealed an intent to discriminate against Shearer on the basis of national origin.  Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001).  The remaining incidents of harassment to which Shearer cites are several derogatory comments from M.M. and Geib. Title VII does not set forth "a general civility code for the American workplace."  Burlington Northern & Santa Fe Ry. Co. v. White,

548 U.S. 53, 68 (2006) (citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75,

80 (1998)).  In other words, "the ordinary tribulations of the workplace, such as the

sporadic use of abusive language, gender-related jokes, and occasional teasing" are not

sufficient to sustain a hostile work environment claim.  <u>Id.</u>  Rather, the "conduct must be

extreme to amount to a change in the terms and conditions of employment."  <u>Faragher v.</u>

<u>City of Boca Raton</u>, 524 U.S. 775, 788 (1998).  The comments and conduct of which

Shearer complains does not rise to the level of severe and pervasive as there is no

evidence that they affected the terms and conditions of Shearer's employment.

Accordingly, the Defendants are entitled to summary judgment on this claim as Shearer

cannot demonstrate a prima facie case of hostile work environment based on national

origin.

### b.    LaRochelle's Race-Based Claim

In support of her race-based hostile work environment claim, LaRochelle points to

the same set of facts that she alleged in support of her disparate treatment claim.

LaRochelle alleges that Baron Geib referred to her as "House Nigger" in addition to

telling LaRochelle that "he was going to request that Plaintiff work on his wing whenever

present in the building because Plaintiff did not talk 'Ghetto' like every other 'Nigger'

there."  Pl. LaRochelle Resp. at p. 11.  LaRochelle states that she reported Geib's racially

derogatory slurs to a supervisor but nothing was done in response.  <u>Id.</u>

Where no serious or severe incidents occur, an individual cannot rely upon casual,

isolated, or sporadic incidents to advance a hostile work environment claim.  <u>McCloud v.</u>

<u>United Parcel Service, Inc.</u>, 543 F. Supp. 2d 391, 399 (E.D. Pa. 2008). This is true even

where the acts of harassment alleged are verbal utterances of racial epithets.  Id. (observing that "isolated, sporadic incidents of racially or sexually charged comments do not constitute 'severe or pervasive 'conduct that is actionable under Title VII."). The alleged remarks by Geib are undoubtedly troubling. However, LaRochelle is unable to point to any other incident when this occurred other than in June 2010, shortly after LaRochelle began working at Lancashire Hall. Doc. No. 84-1 at p. 11. LaRochelle often alleges that the racial harassment "continued" after this date, but she does not point to any other specific times, with evidentiary support, other than the June 2010 incident. Id.

Courts have refrained from allowing such claims to proceed when the plaintiff is not able to point to a clear pattern or incidents of harassment. See Rosati, 94 F. Supp. 3d at 716 (finding that three specific incidents over a four-month period "is not a continuous period of harassment"); Saidu-Kamara, 155 F. Supp. 2d at 439–40 (E.D. Pa. 2001) (granting summary judgment on hostile work environment claim because four incidents over a period of a year and a half are insufficient evidence of a hostile work environment); Funayama , 2011 WL 1399844, at *13 (finding that co-worker's asking plaintiff out on dates, touching her side, and making comments about her body over four-year period was not sufficiently severe or pervasive). Likewise, here, LaRochelle is unable to establish, through record citation to evidence, that her race-based hostile work environment claim is actionable. Therefore, I will grant summary judgment on this claim.

### c.    *Vasquez's Race-Based Claim*

Vasquez's race-based hostile work environment claim is predicated on allegations that Charge Nurse, Geib, harassed her because of her Hispanic heritage by calling her

"Spic," told her to "'go back home' to 'her people' because Black and Hispanic individuals do not speak 'proper English,'" and stated that "she was not good enough to live in the United States of America." Pl. Vas. Resp. at p. 9. Defendants move for summary judgment on this claim, arguing that there is no vicarious liability because Geib was merely a co-worker and Defendants never had notice of Geib's alleged harassment. Because I agree with Defendants, I will grant their motion for summary judgment on this claim.

There is no genuine dispute of material fact that Geib was not a "supervisor" for purposes of Title VII harassment. The "basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a coworker." Huston v. Procter & Gamble Paper Prods., 568 F.3d 100, 104 (3d Cir. 2009). In cases where the alleged sexual harassment is done by a co-worker (not a supervisor) liability only attaches if the employer "failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Id. In Vance v. Ball State University, the U.S. Supreme Court recently held that a person is "a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." 133 S. Ct. 2434, 2439 (2013). Tangible employment actions are those that effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Vance, 133 S. Ct. at 2443. In defining supervisor, the

Court specifically rejected the "nebulous definition" of supervisor, which some lower courts had adopted. Id. In doing so, the Court made clear that "[t]he ability to direct another employee's tasks is simply not sufficient" to warrant the title "supervisor" for purposes of a Title VII hostile work environment claim. Vance, 133 S. Ct. at 2448. This is so even when the plaintiff refers to the alleged harasser as a "supervisor" in some of her pleadings and the alleged harasser's job description gave the harasser leadership responsibilities and power to "supervise" the victim. Id. at 2449, 2454. The dispositive issue, according to Vance, is whether the alleged harasser is empowered to hire, fire, promote, or demote the victim. Id.

Defendants contend that Geib was not Vasquez's "supervisor" because Geib's job description "says nothing about having any decisionmaking authority with respect to personnel." Doc. No. 67-1 at p. 20. Defendants are correct. Geib's job description as a "charge nurse" says nothing about any ability to take tangible employment actions. Ex. P to Defs.' MSJ Regarding Vasquez. Vasquez relies on the fact that Geib's job description states Geib would assist in training and supervising other staff members. Id. However, without more, these characteristics fall short of those of a "supervisor" as described by the Supreme Court. Vance, 133 S. Ct. at 2443. There is no evidence, in the job description or otherwise, that Geib was empowered to hire, fire, demote, promote, or change the benefits of any employees at Lancashire Hall. Therefore, as a matter of law, Geib must be considered a "co-worker" rather than a "supervisor" for purposes of Vasquez's present claim.

Geib's status as a co-worker does not immediately relieve Defendants of liability. However, under the framework for co-workers, Defendants will only be vicariously liable if plaintiffs are able to demonstrate that Defendants "failed to provide a reasonable avenue for complaint, or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and remedial action." Huston, 568 F.3d at 104. There is no dispute that Defendants provided a reasonable avenue for complaint as they had an anti-harassment policy as well as a 1-800 number for its employees to call to anonymously report harassment. Ex. E. to Defs.' MSJ Regarding Vasquez.

Relying on the principles set forth in Huston, Defendants state that liability cannot be imputed to them as the employer because Vasquez never notified any of Defendants' management-level or human resources employees of Geib's alleged harassment.  Doc. No. 67-1 at p. 22. To be vicariously liable for a co-worker's harassment, the employer must first be aware of the alleged harassment. Huston, 568 F.3d at 104. Where an employee has knowledge of harassment, that knowledge can only be imputed to the employer under two circumstances: (1) if "the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that such knowledge is important to the employee's general managerial duties;" or (2) if "the employee is specifically employed to deal with sexual harassment." Id. at 107.[26]

---

[26] Such employees are known as "management-level" employees. Huston, 568 F.3d at 105.

Vasquez alleges that Defendants tolerated Geib's "racial harassment and hostility," Doc. No. 77-1 ¶ 38, but the record does not reflect this.[27] The only evidence of any reporting of Geib's alleged racial harassment came from Vasquez, who testified that two of her co-worker nurses heard Geib's comments. Doc. No. 67-2 ¶ 38.  Aside from this, Vasquez has not presented any evidence that the nurses she allegedly told—or who heard—Geib's comments were "management-level" employees. Nor does she present evidence regarding these nurses' job description or job duties. See Huston, 568 F.3d at 107 (recognizing that "[t]he nature and scope of the duties assigned to an agent are key to imputation within an organization" (quoting Restatement (Third) of Agency 5.03 cmt. C (2006)).[28] Even assuming it is true that two co-worker nurses were aware of Geib's racial harassment, Vasquez has not offered any evidence that either of these nurses was a "management-level" employee. Therefore, there is no genuine issue of material fact that Vasquez cannot make out the fifth element of her race-based hostile work environment claim. Consequently, I will grant summary judgment on this claim.

---

[27] In support of plaintiffs' allegation, plaintiffs cite to an exhibit containing a list of complaints about Geib, none of which contain a single allegation regarding race or sexual harassment. Ex. DD to Pl. Vasquez's Concise Statement of Facts. Plaintiffs also allege, without citation to any evidence, that "Geib [sic] hate speech was stated in public and heard by supervisory management that failed to act." Doc. No. 77-1 ¶ 38. Plaintiffs' briefing does not offer any support either. In response to Defendants motion, plaintiffs state that "Defendants were aware of the race harassment acknowledged by Astree Doc. No. 78 at p. 19. However, again, plaintiffs provide no citation to evidence to support this contention. Id.

[28] The factual scenario in Huston is instructive as to Vasquez's present claim. In Huston, the Third Circuit concluded that certain technicians at a paper company were not "management-level" employees and, thus, their knowledge was not imputed to their employer to create vicarious liability. Id. at 108–09. In arriving at its conclusion, the Court relied on the following facts: "[The employer] did not employ them to discover or to act upon knowledge or rumors of sexual harassment; [they] were employed to keep machines working." Id. at 109. In that case, the court relied on evidence of the technicians' job duties and responsibilities. Id.

### C.    Retaliation Under Title VII, Section 1981, and the ADA

The plaintiffs bring a myriad of retaliation claims pursuant to Title VII, Section 1981, and the ADA.[29] Where a plaintiff does not offer direct evidence of retaliation, courts evaluate retaliation claims under the McDonnell Douglas framework. Anderson, 621 F.3d at 270. To establish a prima facie case of retaliation, the plaintiff must prove: (1) they engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) a causal connection between the protected activity and the adverse employment action. Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006).

With respect to the first element, protected activity may take the form of either "participation" or "opposition." Washco v. Fed. Express Corp., 402 F. Supp. 2d 547, 554 (E.D. Pa. 2005). The opposition clause of Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants . . . because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3. The participation clause forbids employers from discriminating against any employee or applicant "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. Id. With respect to the second element, retaliation claims—unlike other Title VII claims—do not limit adverse employment actions to those that "affect the terms and conditions of employment." Moore, 461 F.3d at 341. What is required is a showing that a reasonable employee would

---

[29] The U.S. Supreme Court has held that Section 1981 encompasses retaliation claims. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008).

have found the retaliatory actions "materially adverse," which means that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). With respect to the causation component, the court must consider whether "a reasonable jury could link the employer's conduct to the retaliatory animus." Jensen v. Potter, 435 F.3d 444, 449 n.2 (3d Cir. 2006). To assess this, the court may consider the "'temporal proximity' between the plaintiff's protected activity and the employer's allegedly retaliatory response, and the 'existence of a pattern of antagonism in the intervening period.'" Gray v. Barney, No. 13-1055, 2016 WL 369360, *9 (D. Del. Jan. 29, 2016).

### 1.    LaRochelle's Title VII Retaliation Claim

Defendants move for summary judgment on LaRochelle's retaliation claim. Defendants do not dispute that LaRochelle has made out a prima facie case of retaliation. Rather, Defendants argue that LaRochelle failed to exhaust her administrative remedies under Title VII and thus her retaliation claim must fail. Defendants renew the administrative-exhaustion arguments they made in support of their motion for summary judgment on LaRochelle's race-based disparate treatment claims under Title VII. Doc. No. 64-1 at pp. 6–8. However, unlike those claims, LaRochelle's retaliation claim falls "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.1996). For one, LaRochelle specifically checked the box "retaliation" in her EEOC charge of discrimination. Ex. O to Defs.' MSJ Regarding LaRochelle. In addition, LaRochelle provided clear details of a

retaliation claim in her description: "I participated in activity protected under EEOC laws

. . . . I allege the foregoing constitutes unlawful harassment because of my gender and age

*and retaliation* for complaining about unlawful discrimination. Id. (emphasis added).[30]

LaRochelle's EEOC charge even mentions the September 29, 2010 written complaint that

preceded her termination two days later. Id. Therefore, LaRochelle properly exhausted

her administrative remedies with respect to her Title VII retaliation claim.

    As for the merits of her Title VII retaliation claim, LaRochelle has come forth

with sufficient evidence to raise a genuine dispute of material fact, thereby precluding

summary judgment. The evidence cited by LaRochelle demonstrates that she made it

known to her supervisors that she felt she was being harassed by Bernard. LaRochelle's

testimony indicates that she aired her complaints to several supervisors in the month or

two preceding her termination. Specifically, LaRochelle testified she gave a written

statement to Astree, the Director of Nursing, indicating Bernard had touched her

inappropriately.  LaRochelle Dep. 39:1–17. This was in September 2010. LaRochelle

also notified Michael Stuck of Bernard's alleged sexual harassment a few weeks prior to

her termination. Id. 34:22–35:5. LaRochelle specifically testified that she told Elizabeth

Woland of the harassment on September 30. Id. 40:20. One day later, Defendants fired

LaRochelle after Woland allegedly ripped up her complaint without reading it. Id. 41:7–

14. Therefore, there is a genuine dispute of material fact as to whether LaRochelle's

complaints about harassment were linked to her termination. The temporal proximity

---

[30] This is unlike LaRochelle's allegations of race discrimination which, as discussed above, were not mentioned at all in her EEOC charge.

(two days) between the time Woland allegedly ripped up LaRochelle's complaint and the day she was fired further exacerbates this genuine issue of material fact. Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) ("In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection.") (internal quotations marks omitted). Clearly, a reasonable jury could find that LaRochelle was terminated in retaliation for reporting protected activity under Title VII.[31] Therefore, I will deny Defendants' motion for summary judgment on LaRochelle's Title VII retaliation claim.

## 2.    Vasquez's Retaliation Claim

Defendants argue that summary judgment should be granted on Vasquez's retaliation claim because she failed to exhaust her administrative remedies. Doc. No. 67-1 at p. 6. In the alternative, Defendants argue Vasquez has failed to make out a prima facie case of retaliation, and even if she had, she is unable to rebut the Defendants' proffered non-retaliatory reason. Id. at pp. 8–13.

### a.    *Administrative Exhaustion*

Vasquez properly exhausted her administrative remedies under Title VII. "The relevant test in determining whether appellant was required to exhaust her administrative remedies . . . is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Waiters

---

[31] Defendants do not articulate a legitimate non-discriminatory reason in response to LaRochelle's Title VII retaliation claim. Doc. No. 64-1.

v. Parsons, 729 F.3d 233, 237 (3d Cir. 1984). In making their exhaustion argument,

Defendants rely on an unreported district court decision interpreting the Third Circuit's

decision in Waiters v. Parsons, 729 F.2d 233 (3d Cir. 1984). Specifically, Defendants

argue that Vasquez cannot maintain her retaliation claim because she never filed a new

EEOC charge following her termination. Doc. No. 67-1 at pp. 6–8. However,

Defendants' argument regarding the principles of administrative exhaustion explained in

Waiters is misplaced.

      In Waiters, the Third Circuit held that "the relevant test in determining whether [a

party is] required to exhaust her administrative remedies . . . is whether the acts alleged in

the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or

the investigation arising therefrom." 729 F.2d at 237. The court further stated: "Where

discriminatory actions continue after the filing of an EEOC complaint . . . the purposes of

the statutory scheme are not furthered by requiring the victim to file additional EEOC

complaints and re-starting the 180 day waiting period." Waiters, 729 F.2d at 237. Relying

on these principles, the court held that even though the appellant had not filed a new

EEOC charge following her discharge, her retaliation claim could proceed because it was

fairly within the scope of her prior EEOC charge. Id. at 237–38. The court also relied on

evidence that a "pattern of events" following the appellant's EEOC filing demonstrated a

nexus between her discharge and filing. Id. Finally, it concluded "that appellant's current

claim falls within the scope of the prior investigation, and that appellant would be entitled

to sue on the complaint that led to that investigation." Id. at 238. Based on this, the court

found that "appellant was free to bring this suit without further exhausting her administrative remedies." Id. at 235.

Here, Vasquez sets forth the timeline of her multiple EEOC charges, the filing of the present federal lawsuit, and the Defendants' treatment and discharge of her following the filing of this lawsuit. On April 13, 2012, Vasquez filed her first EEOC charge against Defendants, claiming that she had been subject to sexual harassment in violation of Title VII. Ex. J to Defs.' MSJ Regarding Vasquez. Several months later, on August 14, 2012, Vasquez filed an amended EEOC charge, adding claims for race discrimination and retaliation. Ex. N to Defs.' MSJ Regarding Vasquez. Just like the appellant in Waiters, Vasquez asserts that the Defendants' discharge of her in 2013 was motivated by the same "retaliatory intent" that motivated Defendants alleged retaliation outlined in her prior EEOC charge. See Waiters, 729 F.2d at 238 (rejecting employer's argument that the "different nature" and "different circumstances" between the allegations of retaliation in appellant's EEOC charge versus the allegations in her federal lawsuit required appellant to file a new EEOC charge).

Moreover, the nature of Vasquez's case is unique. In most retaliation claims based on a "participation" theory, plaintiffs claim that they were discharged in retaliation for filing EEOC charges. Vasquez's claim is that and then some. Vasquez actually amended her complaint to add a claim that she had been retaliated against—not only for filing EEOC charges in 2012—but also for filing this federal lawsuit in 2013 when she still

worked for Defendants.[32] To require her to now file a third EEOC charge when her federal suit has already been pending is not only unrequired by law, but would also defy all notions of judicial efficiency.[33] The evidence clearly demonstrates that the alleged acts in Vasquez's present suit are fairly within the scope of her prior EEOC charges, which included claims for retaliation, and the investigation arising therefrom. In addition, Vasquez testified that she felt like she was "harassed" for filing this lawsuit against Defendants. See Doc. No. 67-1 at p. 9 (quoting Vasquez Dep. 107:1–14). She testified co-workers were reluctant to work with her specifically because they had heard she sued Defendants. Id. This evidence further shows a pattern of events that occurred after Vasquez filed suit, indicating that Vasquez's discharge grew out of her EEOC charge and federal lawsuit against Defendants. Therefore, Vasquez's failure to file a new EEOC charge following her termination is not fatal to her retaliation claim.

### b.   *Prima Facie Case*

Defendants do not dispute that Vasquez partook in protected activity or that she suffered an adverse employment action. Doc. No. 67-1 at p. 8. Defendants contend that Vasquez cannot make out the third element of a prima facie case: a causal connection between the protected activity and the adverse employment action. Id.

---

[32] Defendants do not address this nuance in their briefing. Nor do the cases they rely on mirror the situation presented by Vasquez's retaliation claim (i.e., they do not involve retaliation for filing of a lawsuit in addition to the filing of EEOC charges). Practically speaking, the uniqueness of Vasquez's situation is likely due to the fact that, by the time most Title VII plaintiffs file an EEOC charge and then a federal action, they no longer work for the defendant-employer.

[33] In essence, Defendants' position would have required Vasquez to file a new EEOC charge one year after this lawsuit had already commenced, wait for her EEOC right-to-sue letter, and then amend her federal complaint again.

The sole argument that Defendants make is that "Plaintiff Vasquez has shown no causal relationship between her protected activity and her separation from employment." Id. However, temporal proximity is but one of several available methods for proving the causation element of a retaliation claim. E.g., Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280–81 (3d Cir. 2000). Other types of circumstantial evidence may be used to make this connection. Id. "For example, a plaintiff may establish the connection by showing that the employer gave inconsistent reasons for terminating the employee." Id. at 281. In some cases, district courts have relied solely on evidence unrelated to temporal proximity in finding that the causation element had been met. Id. In others, courts consider temporal proximity in addition to other factors, such as a pattern of antagonism in the intervening period between the protected activity and adverse employment action. Id. Simply put, the causation inquiry, for purposes of a retaliation claim, "must be considered with a careful eye to the specific facts and circumstances encountered." Id. at 280 n.5.

Turning to the facts of this case, six months between Vasquez's filing of this lawsuit and her termination is not unduly suggestive. Defendants are correct that, on its own, the six-month period of time does not establish causation. Nonetheless, Vasquez points to other circumstantial evidence indicative of a causal connection. In the months after Vasquez filed this suit, Vasquez testified that she was "harassed" by others and did not "feel safe" at work specifically because she filed this lawsuit. Doc. No. 67-1 at p. 9 (quoting Vasquez Dep. 107:1–14). According to Vasquez, people at work would say "don't work with Nicole [Vasquez] because we hear she's suing." Id. Viewing the evidence in a light most favorable to Vasquez, this evidence tends to show a causal

connection. <u>Farrell</u>, 206 F.3d at 280–81. Furthermore, Vasquez presented evidence that, after she filed this suit, she attempted to work shifts for Defendants but was not permitted to. Ex. FF to Pl. Vasquez's Resp., 8/6/13 Email from Vasquez to Garcia. This evidence certainly tends to demonstrate a causal connection. <u>Farrell</u>, 206 F.3d at 280–81. Taking all of the above into account, Vasquez has presented evidence raising a genuine issue of material fact as to whether there was a causal connection between her protected activity and her termination. Vasquez has made out a prima facie case of retaliation.

### c.     *Legitimate Non-Discriminatory Reason*

Confronted with a prima facie case, Defendants must articulate a legitimate, non-discriminatory reason for its termination of Vasquez. <u>Smith</u>, 147 F.3d at 278. Defendants have set forth a legitimate, non-discriminatory reason for the termination of Vasquez. Doc. No. 67-1 at p. 12. Defendants terminated Vasquez after they claim she did not work her "required three days per month." <u>Id.</u> Based on this, Defendants concluded that Vasquez had violated her PRN agreement with them, which warranted termination. <u>Id.</u>

### d.     *Pretext*

To establish pretext, Vasquez must proffer evidence that her employer's reason for terminating her is unbelievable or implausible, or evidence that her engaging in protected activity was more likely than not the motivating cause of Defendants' decision to terminate her. <u>Fuentes</u>, 32 F.3d at 764. Defendants' motion for summary judgment will be denied because she has presented sufficient evidence to create a genuine issue of material fact as to whether Defendants' articulated reason for firing her was really pretext for retaliation.

As mentioned above, Vasquez presented evidence that she was treated less favorably by Defendants following the filing of this lawsuit. She presented evidence that she was shunned at work, denied shifts, and harassed for bringing this action against Defendants. This evidence, on its own, is sufficient to establish pretext. It does not matter that Vasquez now uses this same evidence to prove pretext that she relied on in making out her prima facie case. Jalil v. Avdel Corp., 873 F.2d 701, 709 n. 6 (3d Cir. 1989) ("Although this fact is important in establishing plaintiff's prima facie case, there is nothing preventing it from also being used to rebut the defendant's proffered explanation."); Farrell v. Planters Lifesavers Corp., 206 F.3d 271, 286 (3d Cir. 2000) (noting same). In addition to this evidence, Vasquez has offered other evidence that calls into question Defendants' proffered reason for termination. Particularly telling, Defendants allege Vasquez failed to "work her required three days per month." Doc. No. 67-1 at p. 12. Yet they do not point to any such PRN agreement in existence and Vasquez maintains she never signed one. Doc. No. 78 at p. 12. Vasquez, however, produced Defendants' PRN policy, which states only that PRN employees must work "one shift per month." Ex. G to Pl. Vasquez's Resp. ¶ 4. Moreover, Vasquez has produced payroll records showing that she did in fact work the three shifts per month Defendants claim she was required to. Ex. EE to Vasquez's Resp. Taken together, all the evidence is sufficient to establish pretext. Fuentes, 32 F.3d at 764. Therefore, I will deny Defendants' motion for summary judgment on Vasquez's Title VII retaliation claim.[34]

---

[34] With Vasquez's earlier claims, she only presented evidence of pretext that fell under the first method of proof. Here, Vasquez offers evidence that falls under both methods.

### 3. Shearer's ADA Retaliation Claim

Shearer brings a retaliation claim under the ADA. Doc. No. 76-1. Defendants argue Shearer has failed sufficiently to rebut their legitimate, non-discriminatory reason for firing Shearer by showing pretext. Doc. No. 76-1 at pp. 6–9. Because I agree with plaintiffs, I will deny Defendants' motion for summary judgment on Shearer's ADA retaliation claim.

### a. *Prima Facie Case*

Retaliation claims under the ADA are analyzed under the familiar McDonnell Douglas burden-shifting framework. Williams v. Phila. Housing Auth. Police Dep't, 380 F.3d 751, 758–59 (3d Cir. 2004). "To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997) (citations omitted). The evidence clearly shows that Shearer has made out a prima facie case of retaliation under the ADA. Defendants do not dispute (1) that Shearer engaged in protected activity under ADA, or (2) that Shearer suffered an adverse employment action. The evidence of record also demonstrates a causal connection between Defendants' termination of Shearer and her protected activity. Shearer was terminated by Defendants on September 30, 2011. Ex. T to Pl. Shearer's Resp. Shearer points to evidence that two days prior to being fired, Defendants received notice from her doctors that she had "light

duty" restrictions due to injuries she had suffered. Ex. UU to Pl. Shearer's Resp. Defendants argue they did not actually receive notice of this until after terminating Shearer. However, viewing the evidence in a light most favorable to Shearer, there is a genuine issue of fact regarding whether Defendants knew about this prior to firing Shearer. For one, the notice was addressed to the Defendants. Id. For another, the notice clearly reflects the date of Shearer's visit, which was two days before she was fired. Id.; Ex. T to Pl. Shearer's Resp. (termination slip). A reasonable juror could find a causal connection based on the temporal proximity (two days) between Defendants' notice of Shearer's work limitations and her termination. Therefore, Shearer has made out a prima facie case.

### b.        *Legitimate Non-Discriminatory Reason*

Since Shearer has made out a prima facie case of ADA retaliation, Defendants must articulate a legitimate, non-discriminatory reason for its employment decision. Smith, 147 F.3d at 278. Again, the burden at this stage is one of production rather than ultimate persuasion. Reeves, 530 U.S. at 142. As previously discussed in addressing Shearer's prior claims, Defendants have set forth a legitimate, non-discriminatory reason for its termination of Shearer: patient abuse in violation of the Defendants' Resident Abuse Policy. Thus, the burden shifts to Shearer to establish that Defendants' proffered reason was truly pretext for discrimination based on her national origin.

### c.        *Pretext*

To establish pretext, Shearer has two options. First, she may point to evidence that Defendants' proffered reason is subject to such weaknesses and implausibilities sufficient

to satisfy the factfinder that Defendants' actions could not have been for

nondiscriminatory reasons. <u>Willis</u>, 808 F.3d at 644–45. Second, she may elect to point to

evidence leading a factfinder to reasonably believe that a discriminatory reason was more

likely than not a motivating or determinative factor in her termination. <u>Id.</u> at 645.

### i.      *First Method of Proving Pretext*

As with her other claims, Shearer is unable to rebut pretext by offering evidence

that falls solely under the first method of proving pretext: the "unsubstantiated" DOH

findings and the critique of Defendants' Resident Abuse Policy and decision to terminate

her. Unlike her other claims, however, Shearer has offered evidence, under the second

method of proving pretext, that creates a genuine dispute of material fact as to whether

the Defendants' proffered reason was merely pretext for disability discrimination.

### ii.      *Second Method of Proving Pretext*

Unlike Shearer's other claims, here she does proffer evidence that supports a

finding of pretext. <u>Willis</u>, 808 F.3d at 645. With respect to her ADA retaliation claim, she

offers evidence sufficient to create a genuine issue of material fact as to whether her

request for accommodation was "more likely than not a motivating or determinative

cause" of the employer's decision to terminate her. <u>Willis</u>, 808 F.3d at 645. Specifically,

Shearer argues "Defendants were motivated to terminate Plaintiff's employment to avoid

accommodating her [sic] with light duty." Doc. No. 76-1 at p. 13. To be sure, unlike in

Title VII cases, a request for an accommodation under the ADA is protected activity.

<u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 191 (3d Cir. 2003) ("The right to

request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is 'disabled.'"). An ADA retaliation claim is different from a failure to accommodate claim under the ADA because it is only in the latter that the plaintiff must prove he or she was a "qualified individual with a disability." E.g., Krouse v. Am. Sterilizer Co., 126 F.3d 494, 502 (3d. Cir. 1997) ("Unlike a plaintiff in an ADA *discrimination* case, a plaintiff in an ADA *retaliation* case need not establish that he is a "qualified individual with a disability.") (emphasis in original).

The record indicates that Shearer's doctors sent records to Defendants on September 28, 2011 after examining her injuries. Ex. UU to Pl. Shearer's Resp. The documents indicated that Shearer had work restrictions as a result of injuries to her neck, left shoulder and arm, and left knee and leg. Id. For example, the doctors' orders prohibited Shearer from transferring any patients without assistance. Id. Two days later, on September 30, 2011, Shearer was terminated. Ex. T. Admittedly, the court found that Shearer was unable to show pretext with her previous claims solely through challenging the Defendants' proffered reason. Here, Shearer has done more than that. Rather than simply challenging the proffered reason itself, Shearer has demonstrated an unduly suggestive temporal proximity (two days) between the date Defendants were notified of her work restrictions and the date she was fired. See Farrell, 206 F.3d 271, 286 (3d Cir. 2000) (reasoning that a plaintiff asserting a retaliation claim is entitled to offer the same

72

evidence in proving pretext, such as causation, as they did in support of their prima facie case). In addition to temporal proximity, Shearer has produced evidence that Defendants' supervisors had knowledge of her injury and wrote a report about it. Doc. No. 82-14. This, coupled with the temporal proximity, could certainly lead a reasonable juror could to conclude that the real reason Defendants terminated Shearer was because of their receipt of her work limitations two days prior. See Shellenberger, 318 F.3d 183,

In sum, Shearer has adduced sufficient evidence to create a genuine issue of fact regarding whether Defendants' proffered reason for terminating her was pretext for retaliation in violation of the ADA. Therefore, I will deny Defendants' motion for summary judgment on Shearer's ADA retaliation claim.

### 4.     Riker's Retaliation Claim

Riker brings claims for retaliation. Riker brings her claims pursuant to Title VII and the ADA for allegedly reporting sexual harassment and for requesting accommodation for work injuries.[35] The prima facie case Riker must establish is the same whether her claim is under the ADA or Title VII. Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). To establish a prima facie case of retaliation, Riker must show: (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection between the protected activity and the adverse employment action. Moore, 461 F.3d at 340–41.

---

[35] Riker asserts other bases for retaliation that are not protected activity under Title VII or the ADA (e.g. reporting patient abuse and filing a workers' compensation claim), but that are addressed below in her state-law wrongful discharge claim.

##### a.   *ADA Retaliation*

Plaintiff Riker contends Defendants "terminated [her] employment in retaliation for her requesting accommodation in violation of the [ADA]." Doc. No. 85-1 at p. 21. Defendants maintain that Riker never suffered an adverse employment action because she voluntarily resigned from her position.

Unless there is a claim for "constructive discharge,"[36] an employee's voluntary resignation does not constitute an adverse employment action. Jones v. McCormick & Schmick's Seafood Rest., Inc., Civil No. 1:12-cv-04503, 2014 WL 1669808, at *4 (D.N.J. April 28, 2014) (citing Pa. State Police v. Suders, 542 U.S. 129, 141–42 (2004)); Gallagher v. Sunrise Assisted Living of Haverford, 268 F. Supp. 2d 436, 442 (E.D. Pa. 2003) (granting summary judgment on retaliation claim because plaintiff "fail[ed] to offer evidence of an adverse employer decision" as she "resigned and was not terminated"). Under Title VII or the ADA, Riker cannot make out a prima facie case of retaliation because there is no genuine dispute of material fact that she voluntarily resigned from her job.

In certain cases, the Third Circuit has held that a genuine dispute of material fact regarding whether an employee resigned precludes summary judgment. Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 257 (3d Cir. 2014); Burton v. Teleflex, Inc., 707 F.3d 417, 428 (3d Cir. 2013). For example, in Budhun, the Third Circuit held there was a genuine issue of material fact regarding whether the plaintiff suffered an "adverse

---

[36] To make out a constructive discharge claim, a plaintiff must establish that he or she was discriminated against by her employer "to the point where a reasonable person in his position would have felt compelled to resign." Green v. Brennan, 136 S. Ct. 1769, 1777 (2016). In addition, the plaintiff must also prove that he or she actually resigned. Id. Riker does not argue she was constructively discharged, nor does the record support such an argument.

employment action." 765 F.3d at 257. The employer had concluded that plaintiff's failure to return to work constituted a "resignation" per the terms of their internal policy. Id. However, the plaintiff never signed or wrote any formal written resignation letter. Id. In addition, there was evidence that the plaintiff had been replaced by another employee, her belongings had been packed in a box, and she was told she would be terminated if she returned to work. Id. In Burton, the Third Circuit similarly held that a genuine issue of fact as to whether plaintiff resigned precluded summary judgment. 707 F.3d at 428. The employee had not filled out or signed any written resignation letter, and deposition testimony of several employees conflicted with the plaintiff's testimony as to how the employment ended. Burton, 707 F.3d at 428–29. Moreover, the employer's own personnel file did not indicate that plaintiff had resigned. Id. at 429. In essence, the Third Circuit found that the district court erred because it "ignored the fact that [plaintiff] never tendered her resignation" and the only evidence of resignation was hearsay statements from the employer's witnesses. Id.

    In other contexts, namely when the employee has tendered a formal written resignation letter or evidenced an intent to resign voluntarily, courts have found no genuine issue of material fact on this element. See Jones, 2014 WL 1669808, at *4 (finding no adverse employment action because plaintiff tendered a written resignation); Iadanza v. Bell Atlantic Network Servs., Inc., No. Civ. A. 96-2789, 1998 WL 122249, at *5 (E.D. Pa. Mar. 10, 1998) (granting summary judgment because plaintiff voluntarily resigned from his position and thus suffered no adverse employment action), aff'd 191 F.3d 445 (3d Cir. 1999); Acosta v. Catholic Health Initiatives, Inc., No. Civ. A. 02-1750,

2003 WL 176978, at *15 (E.D. Pa. Jan. 24, 2003) (same); <u>Sherrod v. Phila. Gas Works</u>, 209 F. Supp. 2d 443, 451 (E.D. Pa. 2002) (granting summary judgment in case where plaintiff tendered a resignation, finding that the resignation was "clearly a voluntary act"); <u>Checa v. Drexel Univ.</u>, Civ. Action No. 16-108, 2016 WL 3548517 (E.D. Pa. June 28, 2016) ("Our Court of Appeals has not recognized voluntary resignations to be adverse employment actions" (citing <u>Schofield v. Metro. Life Ins. Co.</u>, 252 F. App'x 500, 503 (3d Cir. 2007)).

Defendants state that Riker "voluntarily resigned her position at Lancashire Hall/Wilmac." Doc. No. 66-2 ¶ 21. In support, Defendants cite to a resignation letter tendered by Riker. <u>Id.</u> The letter states: "To Whom It May Concern: I Sandra Riker hereby voluntarily resign my employment from Lancashire Hall/McWill Group. This resignation is voluntary. I was not coerced by anyone into making this decision." Ex. L to Defs.' MSJ Regarding Riker. The resignation letter was signed by Riker on February 14, 2013. <u>Id.</u> Riker admits that she signed this resignation letter on February 14, 2013 in connection with settling her workers' compensation claims against Defendants. Ex. A ¶ 22 to Pl. Riker's Resp. Riker's affidavit states that, even though she signed the resignation letter, she was "forced" to resign by Defendants' lawyers. Ex. A to Pl. Riker's Resp. She stresses that she was not represented by her current counsel at the time she signed the resignation letter. Interestingly, though, Riker omitted the fact that she was in fact represented by a different lawyer when she signed the resignation letter. See Ex. P to

Defs.' MSJ Regarding Riker, Riker Dep. 7:16–19.[37] Riker also omits the fact that she

previously testified she did not have any questions of her own lawyer, the workers'

compensation judge, or Defendants' lawyers about "any of the papers [she] signed or any

of the terms of your settlement." Id. 13:6–18. Although Riker does not dispute that she

signed the resignation, she states in an affidavit that she was actually terminated by

Defendants a year prior to the resignation for a "no call, no show." Doc. No. 85-4 ¶ 21. In

support of this argument, Riker offers another affidavit by a co-worker, Mischaelle

Santiago, who stated: "January 2012, I observed Sandra Riker's name on the schedule

despite that her physician did not return her to then return [sic] to work. Sandy was then

fired for 'no call, no show.'" Ex. G to Pl. Riker's Resp ¶ 23.

Self-serving affidavits may not be used by a party to create a genuine issue of

material fact. Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir.

2009); Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d. Cir. 2002). In connection

with a motion for summary judgment, "the affiant must ordinarily set forth facts, rather

than opinions or conclusions. An affidavit that is essentially conclusory and lacking in

specific facts is inadequate to satisfy the movant's burden." Maldonado v. Ramirez, 757

F.2d 48, 51 (3d Cir. 1985) (internal quotation marks omitted).  Astree's statement that

Riker was fired for a "no call, no show" is conclusory because it offers no factual detail

regarding this alleged "firing."[38] Moreover, the only piece of evidence Riker offers in

alleging that her resignation was not voluntary is her own self-serving affidavit. Ex. A to

---

[37] This lawyer handled Riker's workers' compensation claims against Defendants.

[38] Admittedly, it is difficult to conceive how Astree would have witnessed Riker being "fired" when, by Riker's own account, she was not present at Lancashire Hall at the time Astree claims to have witnessed her get fired.

Pl. Riker's Resp. This affidavit clearly contradicts the terms of her resignation later, which explicitly state that her decision to resign was "voluntary" and that she "was not coerced by anyone into making this decision." Ex. L to Defs.' MSJ Regarding Riker. Riker's affidavit also directly conflicts Riker's testimony that she had no questions about any of the papers she signed with respect to her workers' compensation settlement. Thus, it is a sham affidavit and may not be used to defeat summary judgment. Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d. Cir. 2007) ("A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."). Even viewing the evidence in a light most favorable to Riker, there is insufficient evidence to raise a genuine dispute of fact that she resigned voluntarily.

Aside from Astree's affidavit, the only evidence Riker relies on in claiming that she was terminated are the findings of a Pennsylvania Department of Labor claims representative who handled her workers' compensation case a year prior to her resignation. Ex. AA to Pl. Riker's Resp. In 2012, the claims representative found that (1) Riker had been last employed on January 3, 2012; (2) Riker was on a leave of absence; (3) Riker informed Defendants of a thirty-pound lifting limitation; and (4) Defendants did not offer alternate work to Riker. Id. Although these findings establish that Riker was unemployed at some point in 2012 due to an injury, they do nothing to explain her subsequent interaction with Defendants in the months preceding her resignation in

2013.[39] Nor do they provide any evidence that Riker was fired for a "no call, no show" or rebut the fact that she resigned after her workers' compensation claim was resolved.[40]

In sum, the record demonstrates that there is no genuine dispute that Riker resigned voluntarily. Unlike the employees in Burton and Budhun, Riker actually signed and tendered a formal written resignation letter. This letter was read and signed by Riker with the assistance of counsel. Riker testified that she had no questions for the workers' compensation judge, her lawyer, or Defendants' lawyers regarding the written voluntary resignation she executed. Ex. P to Defs.' MSJ Regarding Riker, Riker Dep. 7:16–19; id. 13:6–18. Also unlike the plaintiffs in Burton and Budhun, Riker has been unable to come forward with conflicting testimony from other witnesses, or other evidence, raising a genuine dispute of material fact on the issue of her resignation. In sum, Riker has failed to establish that she suffered an adverse employment action.

Even if Riker could establish she suffered an adverse employment action, her ADA retaliation claim would still fail because she is unable to create a genuine issue of material fact as to the causal connection between her alleged requested accommodation and her alleged termination. Moore, 461 F.3d at 340–41. Riker has produced evidence that she received lifting restrictions from doctors, which were sent to Defendants on January 24, 2012. Ex. X to Riker's Resp. However, Riker actually admits that she had already been working "light duty" at Lancashire Hall for months following her injury in October 2011. Doc. No. 85-17 at p. 3. Thus, Riker cannot, at the same time, maintain

---

[39] The only evidence challenging the resignation is a sham affidavit filed by Riker herself.

[40] Aside from her alleged "termination," Riker does not argue that she suffered any other adverse employment action. Doc. No. 85-4 ¶¶ 21–22; Doc. No. 85-1 at pp. 15–21.

that: (1) Defendants "terminated [her] employment in retaliation for her requesting accommodation in violation of the [ADA]," Doc. No. 85-1 at p. 21; and (2) that she was accommodated and worked "light duty" per Defendants' doctors' restrictions for months. Doc. No. 85-17 at p. 3. In other words, plaintiff has attempted to create a genuine issue of material fact by claiming she was fired for requesting an accommodation, but at the same time, admits that Defendants accommodated her lifting restrictions for months. Riker also contends she first notified Garcia of her "light duty" restrictions on January 24, 2012. Ex. X to Pl. Riker's Resp. Yet in a sworn statement to the Commonwealth of Pennsylvania, Riker contends the "light duty" restrictions had been in effect since October 2011. Doc. No. 85-17 at p. 3. While Riker is certainly entitled to point out genuine issues of material fact, she cannot do so simply by presenting conflicting versions of her own story. Cleveland, 526 U.S. at 1603 ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."). Even viewing the evidence in a light most favorable to Riker, she has failed to create a genuine dispute regarding the causal connection between her request for accommodation and Defendants' adverse employment action.

Accordingly, I will grant summary judgment on Riker's ADA retaliation claim.

### b.    *Title VII Retaliation*

Riker also asserts that she was retaliated against for reporting sexual and racial harassment in violation of Title VII. To establish a prima facie case of retaliation, the

plaintiff must prove: (1) they engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) a causal connection between the protected activity and the adverse employment action. Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006). Because I have already found that Riker did not suffer an adverse employment action, her Title VII retaliation claim fails as a matter of law.[41]

Therefore, I will grant Defendants' motion for summary judgment with respect to Riker's retaliation claim under Title VII.

### D.  Disability Discrimination Under the ADA

In addition to ADA retaliation claims, plaintiffs Riker and Shearer also allege that Defendants are liable for failing to accommodate them under the ADA.

The ADA prohibits employers from discriminating based upon the known physical or mental impairments of a "qualified individual with a disability." 42 U.S.C. § 12112. To make out a prima facie case under the ADA, the plaintiff must establish: (1) that he or she is disabled; (2) he or she is a qualified individual with a disability; and (3) he or she has suffered an adverse employment decision because of that disability. Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001). A "qualified individual" under the ADA is one "who, with or without reasonable accommodation, can perform the essential

---

[41] Additionally, Riker's Title VII retaliation claim also fails because she is unable to establish the first prong (protected activity) or the third prong (causal connection) of a Title VII retaliation claim. Self-serving affidavits may not be used by a party to create a genuine issue of material fact. Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009); Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d. Cir. 2002). "[T]he affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden." Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985) (internal quotation marks omitted). Riker relies exclusively on self-serving affidavits in support of her allegations that she made reports (and was retaliated against) for reporting sexual and racial harassment. See Doc. No. 85-1 at pp. 1–14. At other times, she relies on no citation to any evidence at all. Id. at pp. 1–23. Without more, these self-serving declarations are insufficient to create a genuine issue of material fact. Even if they were sufficient evidence, the information contained within does not establish any coherent timeline or dates sufficient to establish a causal connection.

functions of the employment position that such individual holds or desires." 42 U.S.C.

§12111(8). "To satisfy this requirement, a plaintiff must first demonstrate that [he or she]

'satisfies the requisite skill, experience, education and other job-related requirements of

the employment position that such individual holds or desires.'" Skerski, 257 F.3d at 278

(quoting Deane v. Pocono Med. Ctr., 142 F.3d 138, 145 (3d Cir. 1998)). Second, the

plaintiff must demonstrate that he or she "with or without reasonable accommodation,

can perform the essential functions of the position held or sought." Deane, 142 F.3d at

145. With respect to reasonable accommodation, the plaintiff bears "the burden of

identifying an accommodation, the costs of which, facially, do not clearly exceed its

benefits." Walton v. Mental Health Ass'n of Southeast. Pa., 168 F.3d 661, 670 (3d Cir.

1999).  "Summary judgment may be granted for a defendant only 'in cases in which the

plaintiff's proposal is either *clearly ineffective* or *outlandishly costly.*'" Skerski, 257 F.3d

at 284 (quoting Walton, 168 F.3d at 670) (emphasis in original)). If the plaintiff

establishes his or her burden, then the burden shifts to the defendant who must

demonstrate that the proposed accommodation would work an "undue hardship." Id.; 42

U.S.C. § 12111(10)(B).

### 1.    Shearer's Reasonable Accommodation Claim

Defendants move for summary judgment on Shearer's failure to accommodate

claim under the ADA. Doc No. 65-1 at p. 6; Doc. No. 65-2 ¶¶ 40–43. In response,

Shearer states that she "presented evidence that WILMAC Defendants did not

accommodate her under the [ADA]. Garcia testified that WILMAC Defendants do not

accommodate non-work related injuries. . . . Defendants terminated Plaintiff [Shearer]

after receipt of work restrictions from Dr. Rochester." Doc. No. 76-2 ¶ 40. This evidence is insufficient to establish a prima facie claim for failure to accommodate under the ADA.

Shearer does not allege or offer any evidence that she is a "qualified individual with a disability" under the ADA, which is the second prong required to establish a prima facie case. Skerski, 757 F.3d at 278. As explained by the Third Circuit, Shearer "bears the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." Walton, 168 F.3d at 670. Shearer has not alleged or offered evidence that she proposed any accommodation to Defendants. Nor has she discussed the costs and benefits of any such proposed accommodation. Although Shearer presents some medical records indicating she suffered from a back injury, Ex. UU to Pl. Shearer's Resp., she does not indicate that she requested any accommodation for this, let alone a reasonable one. See Skerski, 257 F.3d at 284 (providing a non-exhaustive list of "reasonable accommodations" that employees may request from their employers); 42 U.S.C. § 12111(9)(B). In the same vein, Shearer does not claim that she can perform the "essential functions" of her position as a CNA with or without reasonable accommodations. Indeed, she does not allege or offer evidence of what she believes the "essential functions" or her position to be. Simply put, she has failed to establish that she is a qualified individual with a disability as contemplated by the ADA.

In addition, Shearer's sworn testimony in her prior workers' compensation case negates her ability to prove she is a "qualified individual with a disability" under the ADA. The U.S. Supreme Court has explained that summary judgment is proper, under certain circumstances, when an ADA plaintiff makes sworn statements in a prior

application for disability benefits that he or she is "unable to work." Cleveland v. Policy

Mgmt. Sys. Corp., 526 U.S. 1597, 1603 (1999). An ADA plaintiff must prove he or she is

a "qualified individual." Id. It follows that a prior sworn statement that he or she is unable

to work precludes the plaintiff from establishing that he or she can perform the "essential

functions" of his or her job. Id. An ADA plaintiff can avoid summary judgment when

such a circumstance arises only by offering a sufficient explanation for the discrepancy.

Id. "[A]n ADA plaintiff cannot simply ignore the apparent contradiction." Id. Here,

Shearer made a sworn statement in her petition for workers' compensation benefits that

she hurt herself "while repositioning resident who weights [sic] more than 400 lbs." Doc.

No. 82-7 ¶ 4. She further attested that this injury caused her to stop working, id. ¶ 9, and

that she was fully disabled at the time she filled out the claim. Id. ¶ 14. Shearer has not

offered a "sufficient explanation" for this contradiction between her prior workers'

compensation claim and her current ADA claim. Cleveland, 526 U.S. at 1603.[42] Shearer

also applied for social security benefits and stated that, as of September 30, 2011, "she

can only lift ten pounds." Doc. No. 82-27 at p. 6 (citing Shearer's Statements). She has

failed to offer a sufficient explanation for this statement as to her current ADA claim,

---

[42] That the court in Cleveland referred to a Social Security petition rather than a Workers' Compensation petition is not relevant to the analysis. The court's reasoning turned on the fact that the ADA plaintiff had made one statement in a prior claim for benefits and a totally different statement in a subsequent claim. This contradiction of sworn testimony presents the same dilemma whether the claim is one for disability benefits or workers' compensation. Indeed, the Court relied on the general principle that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland, 526 U.S. at 1603; cf. Turner v. Hershey Chocolate U.S., 440 F.3d 604, 608 (3d Cir. 2006) (finding claimant's statements on social security application insufficient to estop her subsequent ADA claim because she had requested a reasonable accommodation and the district court failed to take into account that the social security findings did not account for plaintiff's proposed accommodation).

which requires her to prove she can perform the essential functions of her job as a CNA with or without reasonable accommodation.

Based on the foregoing, it is clear that there is insufficient evidence to lead a reasonable juror to conclude that Defendants are liable for failure to accommodate under the ADA. Therefore, I will grant summary judgment on Shearer's ADA claim.

## 2.    Riker's Reasonable Accommodation Claim

Defendants also move for summary judgment on Riker's ADA claim. Defendants specifically argue that Riker has not made out a prima facie case because she cannot demonstrate the second element—that she is a qualified individual with a disability. Doc. No. 66-1 at pp. 10–14. In response, Riker states she "was able to work with accommodation." Doc. No. 85-1 at p. 21.[43]

---

[43] Riker does not cite to any record evidence to support this proposition. She also cites to Garcia's deposition, stating: "Garcia admitted that she did not know the term 'interactive discussion' and she was not trained on 'interactive discussion' required under the Americans with Disabilities Act." Doc. No. 85-1 at p. 20. However, an examination of Garcia's testimony makes clear that this is an obvious misrepresentation of the record. The testimony of Garcia referenced by plaintiffs actually reads:

     Q      What does employment law mean to you?

     A      I learned about ADA, FMLA, a bunch of things on sexual harassment, discrimination.

     Q      Do you know what the word interactive process is?

     A      No.

     Q      So you weren't taught interactive discussion relative to the ADA?

            [Objection]

     A      If you can explain what it . . . .

See Ex. J to Pl. Riker's Resp., Garcia Dep. 43:15–25. While Garcia states she was not familiar with the legal term "interactive process," she never testified (as plaintiffs contend) that she "was not trained" on interactive process. Rather, she asked for clarification on what the term meant. The court finds it disingenuous for plaintiffs to allege that she was not trained on this topic when, in their own exhibits, they cut off Garcia's deposition response to the question posed, preventing a full inquiry into Garcia's knowledge of the interactive process.

The only element of Riker's present claim at issue is whether or not she is a "qualified individual" under the ADA. To assert an ADA claim for failure to accommodate, the plaintiff must show that he or she is a qualified individual. See Hohider v. United Panel Serv., Inc., 574 F.3d 169, 191 (3d Cir. 2009) (explaining that the ADA, unlike Title VII, does not protect all from discrimination but rather only those who can perform the essential functions of their job with or without reasonable accommodation). As noted, this involves a two-step inquiry. First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." Deane v. Pocono Med. Ctr., 142 F.3d 138, 145 (3d Cir. 1998) (citing 29 C.F.R. § pt. 1630, app. § 1630.2(m)). "Second, it must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought." Deane, 142 F.3d at 145. Riker has produced evidence that she injured her shoulder and that her doctors notified Defendants that she could not lift more than thirty pounds. Exs. W, X to Pl. Riker's Resp. However, Riker has failed to make any argument of what the essential functions of her positions as a CNA are. Doc. No. 85-1 at pp. 19–21. Nor has Riker satisfied her "burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." Walton, 168 F.3d at 670.

Although Riker offers evidence of a lifting restriction imposed by her doctor, she has not offered any evidence of an accommodation that she proposed to Defendants to deal with her lifting restriction. Riker puts the cart before the horse by relying on Garcia's testimony that Defendants would not accommodate a thirty-pound lifting restriction if it

86

is not work-related. Ex. Y to Pl. Riker's Resp. Employers are only under a duty to make reasonable accommodations if the employee meets her burden of proving she is a "qualified individual" under the ADA's statutory framework. Hohider, 574 F.3d at 191 ("[The ADA] does not prohibit discrimination against *any individual* on the basis of disability, but, as a general rule, only protects from discrimination those disabled individuals who are able to perform, with or without reasonable accommodation, the essential functions of the job they hold or desire") (emphasis in original); Williams, 380 F.3d at 772. It is undisputed that the burden is on the plaintiff—not the defendant—to establish that he or she is a qualified individual. E.g., Hohider, 574 F.3d at 191; Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 326 (3d Cir. 2003).[44] Plaintiff Riker has not offered any evidence to this point. Similarly, Riker's reliance on the interactive process fails to address the preliminary question of whether she is a qualified individual under the ADA. Courts must first determine whether an employee is a qualified individual with a disability before deciding whether there was a breakdown in the "interactive process" because the ADA only protects qualified individuals. See Conneen, 334 F.3d at 325–26. Riker has not made a single argument, or proffered evidence, to support a finding that she is a "qualified individual" under the ADA. To be sure, the ADA's corresponding regulations set forth numerous methods of proof available to parties seeking to establish the "essential functions" of a job position. 29 C.F.R. §

---

[44] Nonetheless, Riker's evidence establishes that Defendants did accommodate her lifting restrictions, for months, until she was admittedly taken out of work by Dr. Olveri: "I was injured at work in Oct of 2011. I was given restrictions by the employers [sic] physician and worked light duty until Jan 3rd when the employers physician Dr. Olveri took me out of work for 2 weeks." Doc. No. 85-17 at p.3. Riker admits she continued to see Defendants' company doctor through March 21, 2012. Id.

1630.2(n)(3). These include written job descriptions, the employer's judgment, and the amount of time spent on the function. Id. Riker does not point to a written job description for CNAs at Lancashire Hall, the amount of time CNAs spend lifting, or any other possible evidentiary basis on this point. Id.[45] She is unable to make out a prima facie case under the ADA because she cannot raise a genuine dispute that she was a "qualified individual with a disability" under the ADA.

Accordingly, I will grant summary judgment for Defendants on Riker's ADA claim.

### E.      Wrongful Discharge

All the plaintiffs bring wrongful discharge claims under Pennsylvania law. Doc. No. 29 ¶¶ 129–139. Defendants move for summary judgment on these claims, arguing they fail as a matter of law.

In Pennsylvania, "as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." Clay v. Advanced Computer Applications, Inc., 559 A.2d 917, 918 (1989). "Exceptions to this rule have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy." Id. at 918–19. An indispensable element of a wrongful discharge claim is "a finding of a violation of a clearly defined mandate of public policy which 'strikes at the heart of a citizen's social right, duties, and responsibilities.'" Yetter v. Ward Trucking Corp., 585 A.2d 1022, 1026

---

[45] One of Riker's exhibits, Ex. FF, is a copy of Defendants' "Charge Nurse" job description. However, Riker was a Certified Nurse Assistant ("CNA") not a Charge Nurse. Doc. No. 85-4 ¶ 1.

(1991) (quoting Hineline v. Stroudsburg Electric Supply Co., Inc., 559 A.2d 566, 568

(1989)). In order to assert a claim for wrongful discharge, the plaintiff must have no

available statutory remedy. Novosel v. Nationwide Ins. Co., 721 F.2d 894, 898 (3d

Cir.1983); see Palazzolo v. Damsker, Civ. Action No. 10-cv-7430, 2011 WL 2601536, at

*7 (E.D. Pa. June 30, 2011) ("[I]t is the *existence* of a statutory claim, and not

the *success* of one that determines preemption.") (emphasis in original).

Courts have routinely dismissed wrongful discharge claims when the plaintiffs

who bring them have available statutory remedies for alleged discrimination or

retaliation. See, e.g., Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 659 (3d Cir.

1990); Jafar v. Wells Fargo Bank, N.A., C.A. No. 14-6411, 2015 WL 1781703, at *2

(E.D. Pa. Apr. 15, 2015) (availability of remedies under Title VII, the ADEA, and ADA

precluded plaintiff's wrongful discharge claim); Hicks v. Arthur, 843 F. Supp. 949, 957

(E.D. Pa. 1994) (dismissing wrongful discharge claims when statutory relief for race

discrimination was available through Section 1981, the PHRA, and Title VII). Plaintiffs

do not dispute they were all at-will employees. Here, nearly all of the evidence plaintiffs

have adduced support claims that can be properly addressed through the available

statutory claims pursued under Section 1981, Title VII, the ADA, and the PHRA. As

evident from the record before us, the gravamen of plaintiffs' accusations is that the

Defendants discriminated and retaliated against the plaintiffs on the basis of their race,

sex, national origin, and disability. Clearly, such claims are pursuable through Title VII,

Section 1981, the ADA, and the PHRA. Hence, as a matter of law, the plaintiffs'

allegations of gender, race, sex, national origin, and disability discrimination may not be pursued under the guise of a wrongful discharge claim. Novosel, 721 F.2d at 898.

However, plaintiffs also allege wrongful discharge claims on other bases: (1) retaliation for reporting patient abuse; and (2) retaliation for filing workers' compensation claims.

### 1.    Reporting Patient Abuse

First, all the plaintiffs allege in affidavits that they were retaliated against for reporting Defendants' alleged "patient abuse" of residents at Lancashire Hall. Doc. No. 84-1 at pp. 15–16. Specifically, plaintiffs allege that they were wrongfully discharged in violation of Pennsylvania's Older Adults Protective Services Act, 35 P.S. § 10225.101 *et seq* ("OAPSA"). Id. at pp. 20–21; Doc. No. 85-1 at p. 22; Doc. No. 76-1 at p. 17. An examination of Pennsylvania law makes clear that these allegations do not support cognizable wrongful discharge claims. This is because, as plaintiffs correctly point out, individuals may pursue a private right of action if they feel they are retaliated against for reporting activity protected by the OAPSA. See 35 P.S. § 10225.302.[46] In other words, plaintiffs had an "available statutory remedy" in OAPSA. Because there is an available statutory remedy in OAPSA, plaintiffs may not pursue their claims as common law

---

[46] The OAPSA's retaliation provision provides:

> Any person making a report or cooperating with the agency, including providing testimony in any administrative or judicial proceeding, and the victim shall be free from any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity. Any person who violates this subsection is subject to a civil lawsuit by the reporter or the victim wherein the reporter or victim shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

35 P.S. § 10255.302(c); 35 P.S. § 10255.302(c.1).

wrongful discharge claims. <u>Novosel</u>, 721 F.2d at 898; <u>Palazzolo</u>, 2011 WL 2601536, at *7. Plaintiffs' Third Amended Complaint did not assert a claim for retaliation under OAPSA. Doc. No. 29; <u>see</u> <u>also</u> <u>Kocher v. Larskville Borough</u>, 926 F. Supp. 2d 579, 605 (M.D. Pa. 2013) (recognizing that it is well established that "[a] plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment"). Therefore, Defendants' motion for summary judgment on plaintiffs' wrongful discharge claims based on reporting patient neglect is granted.

### 2.    Workers Compensation Claims and Work-Related Injuries

Plaintiffs Riker and Shearer also assert wrongful discharge claims based upon their reporting of workers' compensation claims. Doc. No. 29 ¶¶ 57, 76.[47] Unlike plaintiffs' other allegations, Pennsylvania has recognized a cause of action for terminating an at-will employee in retaliation for filing a workers' compensation claim. <u>Shick v. Shirey</u>, 716 A.2d 1231, 1237 (Pa. 1998).

Wrongful discharge claims are analyzed under the same framework as a Title VII retaliation claim. <u>Owens v. Lehigh Valley Hosp.</u>, 103 A.3d 859, 861 (Pa. Commw. Ct. 2014); <u>Landmesser v. United Air Lines, Inc.</u>, 102 F. Supp. 2d 273, 277–78 (E.D. Pa. 2000). To state a prima facie case for wrongful discharge, Riker and Shearer must show: (1) they engaged in protected activity; (2) the employer took and adverse employment

---

[47] Plaintiff Shearer also alleges a wrongful discharge claim for purportedly requesting leave under the Family Medical Leave Act ("FMLA"), claiming that she was retaliated against in "violated public policy." Doc. No. 29 ¶ 76. For the same reasons discussed above with respect to plaintiffs' "patient abuse" claims, Shearer's wrongful discharge claim could have been brought under the available statutory remedy of the FMLA. However, neither Shearer nor any plaintiff brought a count under the FMLA. Doc. No. 29. Therefore, any such claim will not be addressed by the court. Nor could an FMLA claim be analyzed as a state-law wrongful discharge claim. <u>Schoch</u>, 912 F.2d at 659; <u>Jafar</u>, 2015 WL 1781703, at *2; <u>Hicks</u>, 843 F. Supp. at 957.

action against them; and (3) a causal link between the protected activity and the

employer's adverse action. <u>Landmesser</u>, 102 F. Supp. 2d at 277–78. As with Title VII

retaliation, if either Riker or Shearer makes out a prima facie case, then Defendants may

articulate a legitimate, non-discriminatory reason for its adverse employment action.

<u>Daniels v. Sch. Dist. Phila.</u>, 776 F.3d 181, 193 (3d Cir. 2015); <u>Landmesser</u>, 102 F. Supp.

2d at 277–78. If the employer makes this showing, the burden shifts back to the plaintiff

to prove pretext: that "the employer's proffered explanation was false, and that retaliation

was the real reason for the adverse employment action." <u>Daniels</u>, 776 F.3d at 193

(quoting <u>Moore</u>, 461 F.3d at 342).

### a. *Riker*

It is undisputed that, under Pennsylvania's wrongful discharge jurisprudence,

Riker engaged in protected activity by filing a claim for workers' compensation against

Defendants. <u>Shick</u>, 716 A.2d at 1237. However, as noted earlier in this opinion, Riker is

unable to establish the second prong (adverse employment action) of a prima facie case

because she voluntarily resigned from Defendants' employ in connection with settling

her workers' compensation claims.[48]

Even if she did not voluntarily resign, Riker would still be unable to establish a

causal connection between the filing of her workers' compensation claim and any other

adverse employment action. <u>Owens</u>, 103 A.3d at 861 (wrongful discharge claims require

proof of the same elements contained in a Title VII prima facie case). Riker has not

---

[48] <u>See</u> <u>supra</u> pages 74–80 of this opinion for a discussion of Riker's resignation.

established the date which she alleges Defendants "fired" her. Riker produced a

document indicating that Defendants challenged her workers' compensation claim on

January 20, 2012. Doc. No. 85-14 at p. 3. However, she also admits that, for a time,

Defendants did pay her unemployment compensation for this injury. Doc. No. 85-17 at p.

3. Aside from this, Riker does not provide a date that she filed her workers'

compensation claim.[49] Without evidence of when Riker actually filed her workers'

compensation claim and when she was allegedly terminated, Riker is unable to create a

genuine issue of fact for a jury regarding the causation element of her wrongful discharge

claim. "A plaintiff must produce at least some evidence that connects the dots between

her claim for workers' compensation and her termination, such as adverse personnel

action promptly after her workers' compensation claim was made, statements by

supervisors referencing her claim, documents from the employer discussing her claim

with respect to her termination, etc." Christman v. Cigas Machine Shop, Inc., 293 F.

Supp. 2d 538, 544 (E.D. Pa. 2003) (quoting Landmesser, 102 F. Supp. 2d at 278). Even

viewing the evidence in a light most favorable to Riker would not be sufficient to

overcome summary judgment. Assuming (without evidence) that Riker filed her workers'

compensation claim on or about October 30, 2011—which is the date of the alleged

injury, and assuming (without evidence) Defendants terminated Riker on or about

January 20, 2012—which is the date they challenged Riker's claim—this would be

insufficient to overcome summary judgment. "The mere fact that an alleged discharge

occurs subsequent to the filing of a claim is insufficient to satisfy the plaintiff's burden of

---

[49] Presumably, it was sometime in October when Riker was injured.

demonstrating a causal link between the two events." <u>Christman</u>, 293 F. Supp. 2d at 544

(citing <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1302 (3d Cir. 1997)).

Therefore, I will grant Defendants' motion for summary judgment on Riker's

wrongful discharge claim.

### b.    *Shearer*

Shearer also brings a wrongful discharge claim based upon her allegation that she

was terminated in retaliation for filing a workers' compensation claim. Third Amended

Compl. ¶ 76. Specifically, Shearer contends she was terminated on September 30, 2011,

in retaliation for her pursuit of a workers' compensation claim with respect to an injury

on September 27, 2011. Doc. No. 76-1 at p. 17. Shearer has offered evidence that she

reported the September 27, 2011 injury to Defendants the day it happened, as well as

other co-workers' and supervisors' incident reports regarding the injury. Exs. W, X, and

MM to Pl. Shearer's Resp. Shearer was terminated on September 30, 2011. Ex. T to Pl.

Shearer's Resp. The record indicates that it was not until October 13, 2011, several weeks

after she was fired, that Shearer filed a workers' compensation claim. Doc. No. 82-7.

This claim was not even related to the September 27, 2011 injury; rather, it was for an

injury Shearer allegedly suffered a year earlier in October 2010. <u>Id.</u> It was not until

December 7, 2011, over a year after her termination, that Shearer filed a workers'

compensation claim for the September 27, 2011 injury. <u>See</u> Ex. B. to Defs.' MSJ

Regarding Shearer ¶ 3.

Based on the foregoing, Shearer could not possibly establish a causal connection

between the filing of her workers' compensation claim and her termination because she

did not file any workers' compensation claim until after she was terminated. Recognizing this, Shearer argues that her wrongful discharge claim must survive summary judgment because she notified Defendants' supervisors that she was injured on September 27, 2011. Recently in Smith v. R.R. Donnelley & Sons Co., our district court entertained a similar issue when analyzing a wrongful discharge claim at summary judgment:

> Here, Plaintiff maintains that he engaged in protected activity under the Pennsylvania Workers' Compensation Act when he reported the work injury on April 19, 2009 to his supervisor. Defendant argues that because Plaintiff did not file a claim petition before the adverse employment action occurred, Plaintiff did not engage in protected activity under Pennsylvania law.

Civ. Action No. 10-1417, 2011 WL 4346340, at *3 (E.D. Pa. Sep. 16, 2011).[50] After the plaintiff reported a work injury to one of his employer's nurses, that nurse sent an email to the employer indicating that she was going to file a workers' compensation claim on the plaintiff's behalf. Id. at *1. After the nurse wrote that email, plaintiff was fired. Id. at *2.

The Smith court reasoned that although "the mere *possibility* of employer liability under the WCA and the mere *awareness* of a work-related injury are insufficient grounds upon which to base a finding of engagement in protected activity, . . . filing a claim is [not] the only conduct that constitutes protected activity." Smith, 2011 WL 4346340, at *5 (emphasis in original). Going further, the court found that "it is the reporting of the work-related injury in conjunction with the employee's expression of intent to file a workers compensation claim that is enough to trigger the protection afforded by the Act."

---

[50] Sitting in diversity jurisdiction, the court acknowledged that the Pennsylvania Supreme Court had not yet addressed this issue. Smith, 2011 WL 4346340, at *3.

Id. at \*6. Based on the foregoing, the court denied summary judgment finding a genuine issue of material fact as to whether plaintiff, after being injured but before being fired, expressed his intent to pursue a workers' compensation claim. Id. at \*6.

In another wrongful discharge case based on retaliation for filing workers' compensation claims, the district court granted summary judgment for the employer when the plaintiff filed her claim weeks after being fired. Alderfer v. Nibco Inc., No. Civ. A 98-6654, 1999 WL 956375, at \*6 (E.D. Pa. Oct. 1999). The court based its finding on the fact that the plaintiff had not filed a claim prior to being fired and had not even mentioned the possibility of doing so. Id. The plaintiff had reported the work injury to her employer prior to being fired. Id. Nonetheless, the court found she had not engaged in protected activity for purposes of a wrongful discharge claim. Id.

Thus, it appears there is a split between how district courts have decided this issue. In Smith, the court fashioned the rule to mean that a plaintiff must (1) report the work injury to her employer, and (2) at the bare minimum, "express an intent" to the employer to file a workers' compensation claim. On the contrary, in Alderfer, even where the work injury was reported to the employer, the court found no protected activity because there was no claim filed prior to termination. It is important to note that opinions "of other district courts are persuasive but not binding authority on this court." Kuhns v. City of Allentown, 636 F. Supp. 2d 418, 437 (E.D. Pa. 2009). Either way, I find that under both the Alderfer approach and the more lenient Smith approach, the evidence of record in Shearer's case is insufficient to withstand summary judgment. It is undisputed that Shearer did not file a workers' compensation claim prior to being fired. Hence, under

96

Alderfer, her activity of merely reporting her work injuries is not protected. Thus, the question under Smith would be: Did Shearer express an intent to file a workers' compensation claim to Defendants? I find that there is no evidence to lead a reasonable juror to conclude that Shearer expressed an intent to Defendants to file a workers' compensation claim following her September 27, 2011 injury. Although she has produced evidence that Defendants knew of her injury, even the Smith court noted that "the mere *awareness* of a work-related injury are insufficient grounds upon which to base a finding of engagement in protected activity." Smith, 2011 WL 4346340, at *5 (emphasis in original). Also unlike the email in Smith, Shearer has not pointed to any evidence that the Defendants were aware of Shearer's intent to file a workers' compensation claim. Therefore, I will grant Defendants' motion for summary judgment on Shearer's wrongful discharge claim.

## V.   CONCLUSION

For all the foregoing reasons, Defendants' motions for summary judgment on plaintiff Shearer's retaliation claim under the ADA (Count IV), plaintiff LaRochelle's retaliation claim under Title VII (Count II), and plaintiff Vasquez's retaliation claim under Title VII (Count II), are denied. Defendants' motions for summary judgment are granted with respect to all other claims.

An appropriate Order follows.